## PARDUE v. UNITED GAS PUBLIC SERVICE CO.

## SAME v. UNITED GAS PUBLIC SERVICE CO. et al.

### Nos. 2529, 2132.

District Court, W. D. Louisiana, Monroe Division.

Aug. 21, 1939.

---

G. P. Bullis, of Ferriday, La., and H. B. Warren, of Shreveport, La., for plaintiff.

Sholars & Gunby, of Monroe, La., Wilkinson, Lewis, Wilkinson & Naff, of Shreveport, La., and H. F. Madison, of Monroe, La., for defendants.

DAWKINS, District Judge.

On August 31, 1931, the plaintiff filed the suit first numbered above, to recover additional royalties on natural gas alleged to be due from lands belonging to petitioner as follows:

| | Cubic Feet |
|---|---|
| From January 1, 1930 to July 7, 1930 | 740,860,000 |
| From August 1, 1930 to November, 1930 | 174,203,000 |
| During December, 1930 and January, and February, 1931 | 94,525,000 |
| Total | 1,009,588,000 |

On January 10, 1934, the second suit was filed, based upon similar claims by petitioner as follows:

| | Cubic Feet |
|---|---|
| For the year 1928 | 761,241,000 |
| For the year 1929 | 2,194,423,000 |
| For the year 1932 | 612,798,000 |
| Total | 3,568,462,000 |

The first case, after many preliminary proceedings and rulings, was finally tried to a jury, and on December 5, 1932, there was a verdict in favor of the plaintiff, fixing the market price of the gas produced by the defendant during the periods in 1932 and 1931, covered by that demand at 4.45¢ per thousand cubic feet. A motion for a new trial was over-ruled on April 11, 1933, and on September 25 of the same year, judgment was signed. On appeal, the verdict and judgment were reversed, 5 Cir., 78 F.2d 929, and the mandate of the Circuit Court of Appeals was filed in this Court, October 7, 1935.

On September 14, 1936, an order was signed to consolidate the first case with the second for the purposes of trial.

On April 15, 1937, trial of the consolidated cases was begun and on the 22nd of the same month, they were submitted to the jury with instructions to return a sealed verdict in accordance with a stipulation of counsel for its opening at a later time when the Judge returned from attending the hearing of a three-Judge case in New Orleans, where he was compelled to go on the evening of the completion of the case before the jury. Further, in accordance with agreement of counsel, certain questions were submitted to the jury, among them being, what was the market price of the gas in both suits, and on July 3, 1937, by pre-arrangement, the jury was recalled, the verdict opened, and it was found that it had fixed the price at 4¢ per thousand cubic feet.

On July 10, 1937, defendant filed a motion for a new trial, which was argued February 4, 1938, and on November 2 of the same year, it was over-ruled.

In the meantime no judgment had been signed, and on March 28, 1939, defendant filed a second motion to reopen the cause or for a new trial, based upon the pleas of prescription and accord and satisfaction, which motion was argued and submitted on April 24, 1939.

This last mentioned motion for a new trial has been vigorously opposed by counsel for plaintiff as coming too late.

Opinion

My view is, that as to the plea of prescription, if only a question of law is involved, being peremptory in its nature, it may be filed at any stage of the case, even on the appeal. La.R.C.C. Art. 3464. There is no dispute as to the facts affecting this plea, and after careful consideration, I have concluded that there is no substantial evidence which required its submission to the jury, for which reason it should have been passed upon when the case was given to the jury. Therefore, regardless of whether, as a strict matter

of procedure, the Court could grant a new trial, I think so long as the judgment is unsigned, as is true at this time, I still have the power and control necessary to consider and dispose of this plea.

■■ Article 3538 of the State Civil Code provides:

"The following actions are prescribed by three years:

"That for arrearages of rent charge

\* \* \* \* \* \* \*

"This prescription only ceases from the time there has been an account acknowledged in writing, a note or bond given, or an action commenced."

Mineral royalties are in the same category with rents and are governed by the prescriptive period of three years under this Article. Logan v. State Gravel Company, 158 La. 105, 103 So. 526; Board of Commissioners v. Pure Oil Company, 167 La. 801, 120 So. 373. Prescription begins to run from the time the debt is due. Breaux v. Broussard, 116 La. 215, 40 So. 639.

■ In the present case, the royalties to the plaintiff as lessor for the gas produced and removed from his land became due each month and the amount thereof which the defendant contends was due was paid accordingly, leaving as a balance for these monthly periods that which the plaintiff now claims. So that, I think, if the pleaded prescription is applicable, it commenced to run as to the balance due each month.

■ In the recent decision of the Court of Appeals for this Circuit handed down in the case of Arkansas Natural Gas Corp. v. Sartor, 5 Cir., 98 F.2d 527, it was held that ten years prescription applies where there were counter claims or set offs pleaded, involving, as the Court expressed it, an accounting. The case of Da Ponte v. Ogden, 161 La. 378, 108 So. 777, was cited as authority. Of course, if the Court of Appeals correctly understood and applied the ruling of the State Court, both it and this Court are bound by that ruling. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. However, since that decision was handed down, the Louisiana State Supreme Court has again had occasion to consider the question of prescription as applied to royalties under mineral leases in Parker v. Ohio Oil Company, 191 La. 896, 186 So. 604, 610. In that case a tutor, who was authorized during the minority of his wards to collect royalties under a mineral lease, continued to do so after they became of age and the latter subsequently sued the Oil Company to recover therefor, notwithstanding the prior payment to the former tutor. The Court held that the Oil Company was bound to take notice of the end of the tutorship, with the attaining of the majority by the minors, and then took up the question of prescription of three years pleaded by the defendant. In disposing of the matter, the Court reviews its former decisions, and I quote therefrom in part as follows:

"(19) The defendant plead prescription of three years under Article 3538 of the Civil Code in bar of all claims arising more than that length of time prior to the date of demand. It is unnecessary to discuss this plea further than to say that this case is not distinguishable from the case of Board of Commissioners v. Pure Oil Co., 167 La. 801, 120 So. 373, which we reaffirm. It was there held that the three-year prescription under Article 3538 of the Civil Code relating to arrearages of rent is applicable to an action to collect oil royalties.

"Counsel for plaintiffs in the present cases have designated these suits as actions 'for an accounting of money had and received', and argue that the prescriptive period of ten years under Article 3544 of the Civil Code is applicable and not that of three years under Article 3538. They say that these cases are like the case of Da Ponte v. Ogden, 161 La. 378, 108 So. 777.

"Counsel are mistaken. The issue involved in these cases is precisely the same as that involved in the Pure Oil Co. Case. In the Pure Oil Co. Case, the lessor had not received the oil royalties or the proceeds thereof due him under an ordinary oil lease.

"As shown by the court's statement of the issues involved in that case, the suit was one to collect 'the balance of the proceeds of royalty oil'. ([120 So.] page 375.) That is what these plaintiffs are demanding, the proceeds of royalty oil. This suit involves an accounting in the sense that defendant is called upon to make up a statement showing the amount of oil extracted from the land and the value of it as of the date extracted. *That would be necessary in any case where a suit is brought to collect an amount due as pro-*

*ceeds of royalty oil, because a plaintiff, the lessor, could not be expected to know the amount of oil extracted or its exact value at the time extracted.* These plaintiffs alleged that they had never received any of the proceeds of the royalty oil, the amount of which they alleged 'cannot be determined without a full disclosure of the whole quantity of oil thus produced, saved and taken, and the amount received therefor or its value at prices prevailing as when produced, saved and taken, which information defendant has and plaintiff has not'.

"In sum, the complaint made by these plaintiffs is that they have not received the fruits of their lease, the rentals due them, and they now demand that they be paid their pro rata shares of these rentals. That is what the plaintiff in the Pure Oil Co. Case demanded, and it was there held that the three-year prescriptive period was applicable. The plaintiffs are not entitled to the benefit of the ten-year prescriptive period as provided by Article 3544 of the Civil Code merely because they have demanded that defendant furnish a statement showing the amount of oil produced and its value. They cannot be permitted to reap the benefits of the longer prescriptive period merely by calling their suit one for an accounting. The case of Da Ponte v. Ogden relied on by plaintiffs has no application here.

"In that case plaintiff demanded 'an accounting of all funds received by the two defendants * * * from said lands since November 9, 1915, by way of royalties for oil or other minerals, or bonuses, or rentals under leases or otherwise, or resulting from sale of timber or other products from the said land', and defendants were 'ordered to render an account of all the funds received by them * * * and to pay the plaintiff the one-sixth of the amounts so received after deducting all sums spent for taxes or other necessary and proper expenses for the preservation and development of said property'.

"In the Da Ponte Case the only prescription plead was that of ten years under Article 3544 of the Civil Code. Three-year prescription under Article 3538 was not mentioned. The reason is obvious. Plaintiff sued the Ogden heirs to recover a one-sixth interest in certain lands and to compel them to execute a title therefor. The lands involved were at the time the suit was filed, and had been for a number of years, in possession of the Ogden heirs, the defendants. Parkerson, their agent and attorney, had charge of, and looked after, the lands for them. The court said that 'For a period of some seven or eight years Parkerson collected oil royalties and proceeds of timber sales from the lands embraced in both judgments, and paid one-sixth thereof to Da Ponte'. The payments were made to Da Ponte because Parkerson considered that Da Ponte owned a one-sixth interest in the lands. But in November, 1915, a spokesman for all the Ogden heirs notified Parkerson to make no further payments to Da Ponte. The request was complied with, and although Parkerson continued to collect 'royalties from these lands', he made no payments to Da Ponte from November, 1915, to April, 1916. In April, 1916, one of the Ogden heirs took over personally for herself and her co-heirs the collection and distribution of the rents and royalties, but paid Da Ponte nothing. Da Ponte was finally recognized by the court as owner of a one-sixth interest in the lands, and claimed his pro rata share of all sums, including oil royalties, proceeds of timber sales, bonuses, or rentals under leases or otherwise, collected by the Ogden heirs during the time they had possession of the land. So that the Ogden heirs, while in possession of the property and while exercising dominion over it, collected the royalties, sold timber and collected for it, and appropriated the entire amount received to their own use and refused to account to Da Ponte for his one-sixth of the proceeds thus derived.

"The court characterized the demand as 'a real action in so far as it seeks to recover an undivided interest in the lands' and as a personal action 'in so far as it calls on defendants to account for and pay over one-sixth of the royalties received from said land'. (Italics ours.)

"We italicize this part of the quotation to bring out the point that the court was considering a case where the defendants were *in possession of another's property*, derived revenues from it, and had 'received' the rents—a case where the relationship of lessor and lessee did not exist between the plaintiff and the defendants, a case where the demand was 'for the return of money had and received' by defendants as rentals paid by third persons. Da Ponte had not leased his land to the

Ogdens for the production of oil, and there were therefore no 'rents' or 'royalties' due him under a lease.

"In the Pure Oil Co. Case the situation was entirely different. There the plaintiff had leased its lands to defendants for the production of oil, and, in case any was found, the lessor, as consideration for the lease, was to receive one-eighth of it as royalty. Following the case of Logan v. State Gravel Co., 158 La. 105, 103 So. 526, where it was held that lands adapted to mining may be leased for a certain portion of the produce of the mine and the fact that such portion is called 'royalty' instead of rent 'is not of the least consequence' ([103 So.] page 527), we held that the royalties due under the lease were in the nature of rents and for that reason an action to recover them was prescribed by three years, as provided in Article 3538 of the Civil Code.

"We adhere to the ruling in the Gravel Co. Case and that in the Pure Oil Co. Case.

"The Da Ponte Case was not mentioned in the Pure Oil Co. Case, although decided nearly three years before. Apparently neither the court nor counsel thought the ruling in the former case had any application to the issue involved in the latter."

In the case of Logan v. State Gravel Company cited in the above quotation, the defendant had "defaulted in its payments", but whether or how much of the accrued rental had been paid is not stated. However, I can see no possible distinction as to the applicable prescription, whether a part or the whole of the royalty or rental is claimed.

The material point is that it was an action to recover royalties under a conventional lease, and not one to require an accounting for funds and property, regardless of the source, as was true in the Da Ponte case, relied on by the Court of Appeals, in the case of Arkansas Natural Gas Corp. v. Sartor, supra.

Had the defendant in the present case paid nothing at all and the plaintiff had been compelled to sue for his entire royalties, under these decisions of the State Court, it could scarcely have been contended that under ordinary circumstances the three years provided by the Article 3538 of the Code did not apply. Can it be seriously argued that, because a portion of what plaintiff claims was paid, a different rule should apply as to the remainder? If

reason and logic are to control, I think not.

My conclusion is that the Supreme Court of the State has now settled the law to the effect that demand for royalties under mineral leases are governed by the prescription of said Article 3538. In the present case, as in all others, where on the face of the pleading or under the evidence, the amount or amounts for royalties are shown to have been more than three years due, the same are barred and cannot be recovered if prescription is pleaded, unless the claimant shows some interruption or reason why it should not apply. It is well settled that in seeking to avoid the legal effect of such a situation, the person claiming that prescription did not begin to run from the time the debt was due, bears the burden of proving or showing facts and circumstances which support an interruption or prevented the commencement of the period necessary to constitute the bar. Egan v. Hotel Grunewald, 134 La. 740, 64 So. 698; Arkansas Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924.

In the last cited case, 78 F.2d 924, beginning at page 928, it was said by the Court of Appeals for this Circuit:

"(7) The plea was good prima facie. Board of Com'rs, etc., v. Pure Oil Co., 167 La. 801, 120 So. 373. Under the law of Louisiana prescription does not run against one who is ignorant of his rights, provided the party pleading it has been guilty of fraud that contributes to the want of knowledge on the part of plaintiff. Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598. But in the absence of fraud, prescription runs against all persons, unless exempted by some provision of the statute. Plaintiffs are not protected by an statutory exemption. In Cox v. Von Ahlefeldt, 105 La. 543, 30 So. 175, it was said that those who claim exemption from prescription by reason of ignorance resulting from fraud must allege and show that such ignorance was neither willful nor negligent; and again, in Littlefield v. City of Shreveport, 148 La. 693, 87 So. 714, it was said that mere passivity cannot arrest the course of prescription, good faith not being required on the part of the person pleading prescription. La.Civil Code, art. 3550.

"(8) The above-cited decisions of the Supreme Court of Louisiana are in line with the general jurisprudence of the country. Statutes of limitation are founded on

public policy and are favored in the law. Mere ignorance of one's rights will not toll the statute of limitations. Concealment by defendant only by silence is not enough. He must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry. There must be reasonable diligence on the part of plaintiff and the means of knowledge are the same in effect as knowledge itself. Anderson v. Gailey (D.C.) 33 F.2d 589; Insurance Co. of North America v. Parr (C.C.A.[4 Cir.]) 44 F.2d 573; Wood v. Carpenter, 101 U.S. 135, 25 L.Ed. 807; United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261. We know of no decision, either of controlling authority or persuasive, holding that mere ignorance on the part of the creditor will toll the statute.

"(9, 10) It is true that where the evidence is conflicting or reasonable minds may draw different conclusions from it, the question of whether the statute would bar the suit is for the jury, but it is elementary that where the evidence is all one way the question becomes one of law for the court. In this case fraud on the part of defendant is neither alleged nor proven. The case for the plaintiff is very much weakened, if not entirely destroyed, by the failure to call Dr. R. A. Sartor as a witness or to prove his unavailability. Dr. Sartor acted as agent for plaintiffs in collecting royalty and they would necessarily be charged with any knowledge that he might have of market prices. The uncontradicted evidence is that if plaintiffs had inquired of defendant they would have been given such information as to market prices as the defendant had. The defendant was under no obligation to do more. We consider that in the circumstances shown the court should have instructed the jury to sustain the plea of prescription. Prejudicial error is shown by this assignment."

The allegations of the petition in the first suit above numbered (after setting forth that defendant had reported and paid for the quantity of gas withdrawn at 3¢) as to the knowledge and information of plaintiff with respect to the market price of gas, are as follows:

"15. No open market for public bidding, and no published prices, exist for natural gas, hence the value of the gas produced from plaintiff's land, to which plaintiff is entitled under the aforesaid lease, can be ascertained only from general conditions and private sales. ...

"16. Plaintiff has requested defendants to inform him what sales have been made of the gas produced from his land. Defendants have failed, neglected and refused to furnish any information whatever to plaintiff on the subject.

"17. Plaintiff has never engaged in the gas business, and has no knowledge of that business except the common knowledge of the inexperienced.

"18. Defendants have been engaged for many years in the business of producing, transporting, and selling natural gas, and are thoroughly familiar with and expert in that business.

"19. Defendants are associated with, and/or subsidiary to, and/or own and control other corporations, especially pipe line companies, all of which constitute together a group of corporations, under substantially one ownership, and under one management and control, which are jointly engaged in the business of producing, transporting and selling natural gas.

"20. Under the aforesaid lease contract between plaintiff and defendants, and because of the relative positions of plaintiff and defendants aforesaid, defendants and the group of corporations aforesaid are the fiduciary agents of plaintiff, and occupy a position of trust toward plaintiff, regarding the one-eighth interest of plaintiff in the gas produced from his land."

The pertinent allegations of the second suit are also quoted as follows:

"8. The sales of said gas have been kept secret and hidden from petitioner and the public, although well known to said producers, until a part of said sales were made public in November, 1932.

\*  \*  \*  \*  \*  \*  \*

"11. Said producers took advantage of petitioner's ignorance, and the secrecy surrounding the sales of gas, to pay to petitioner only a part of the sums due him for said gas, paying him only at the rate of three cents per thousand cubic feet, and deducting from said payment, one-eighth of the severance tax due to the State of Louisiana on said gas.

"12. \*  \*  \*

"Petitioner never owned any of said gas, and under said leases, and the law, owed no part of the severance tax on any gas mentioned in this suit.

\*  \*  \*  \*  \*  \*  \*

"22. Said producers took advantage of petitioner's ignorance of value and market

price to pay to petitioner less that he was entitled to, as hereinabove recited."

Of course, the charge that defendant was a "fiduciary" is a legal conclusion and I think fully disposed of in Arkansas Natural Gas v. Sartor, supra.

The evidence upon the subject and knowledge of the efforts of the plaintiff to obtain information about the market price of gas was given by himself. He was asked and answered questions (note of evidence, p. 71, et seq.) as follows:

"Q. Do you remember about when gas was discovered in the vicinity of Alto? A. Yes, I think it was the latter part of 1926 or the first of '27.

"Q. Had it been discovered before you signed either of these two leases that you signed here? A. Yes.

"Q. What is the character of the country around Alto, or what had it been before that time? What was the general nature of the business carried on? A. It was farming.

"Q. Alto was a little village? A. Yes.

"Q. In a farming country? A. Yes.

"Q. Had you ever had any experience in the gas business when gas was discovered in Alto, or in the Richland field? A. No, sir.

"Q. Had you had any experience in the gas business when you signed these lease contracts? A. No, sir.

"Q. Have you ever had any up until now? A. No, sir.

"Q. Have you ever sold any gas? A. No, sir."

Then, after testifying to some length that there was no market, because of the absence of industries to consume it or pipelines to transport it, and that later certain lines were built into the field about 1928, he was asked and answered questions (note of evidence, p. 78) as follows:

"Q. When and how did it first come to your knowledge that there was a market for the outlet of the gas produced under your lease, or about when? A. 1928.

"Q. What circumstances were coincident with that, what development, what construction of development took place? A. You mean—

"Q. (interrupting) State to the Court what happened, Dr. Pardue, at that time to convince you that there was a market

being provided for the gas? A. Well, there was a contemplation of a pipeline being built into the field.

"Q. I don't mean that; I mean what market did you have, or outlet from the field at that time? A. None whatever.

"Q. When was it first brought to your attention, I mean definitely, by any sort of approach that there was a market, or that there was a pipeline in which or through which that gas could be run? A. 1928."

Plaintiff was next shown a division order directed to the Magnolia Pipeline Company, date September. 28, 1928, providing for payment at 3¢ per thousand cubic feet and admitted he signed it at the insistence of the representative of this lessee, the Ouachita Natural Gas Company, but said he was told this Company was selling it at the price therein provided of 3¢ at that time. The record shown this to be true. It is conceded that some time later, the Magnolia Pipeline Company, to which this gas was being delivered when the division order was signed, was acquired by a predecessor of the defendant, as was also true of the Ouachita Natural Gas Company. For this reason, the defendant concedes the relations became such upon that acquisition as did not constitute independent transactions, but were between instrumentalities controlled by a single organization. Plaintiff further stated that subsequently other lines came into the field and that no information was given him as to the price which they were paying for gas delivered to them. He stated that he obtained his first information as to what price gas was being sold to the pipe lines at the first trial of his earlier numbered case above in November, 1932. Plaintiff was then asked and answered questions (note of evidence, p. 87) as follows:

"Q. When you continued from month to month to receive royalty checks with statements attached, and cashed the checks issued to you, at the rate of 3 cents what knowledge, if any, did you have that that gas was bringing more than 3 cents at pipeline delivery? A. None.

"Q. Was any gas from your wells ever sold except into pipelines, to your knowledge? A. No, sir."

"Q. On all of your monthly statements, royalty statements, from then on out to the time of the filing of these suits were at 3 cents, weren't they? A. Yes, sir.

"Q. Based on two-pound pressure? A. Yes."

On cross-examination, plaintiff stated that he later discovered that the defendant, as lessee, was getting a higher price for the gas from the pipelines than was being paid him, and for that reason, he thought that the statements being sent out each month, purporting to represent market price, were untrue, but that as long as they were selling the gas to the Magnolia Pipeline Company at that price, they did not try to deceive him. He also stated he thought they were misrepresenting the situation when they paid him at two-pounds pressure, when they were selling at eight ounces.

Plaintiff further testified on cross-examination that, although he had received a limited academic education, he had attended and graduated from a medical college at Memphis, Tennessee, and began practicing in the community near where he now lives about 1910; that he has at times likewise engaged in the mercantile business; that when acreage was being assembled for drilling purposes he did not. put his land in the drilling block, although his lands were located some four miles from where the first well came in; that he had bought and sold royalties or mineral rights to "protect himself in different directions" and had about a thousand acres of his own; that he had realized between $12,000 and $15,000 from bonuses and rentals on his land; and that he executed documents to pool some of his leases in order to get them drilled after the land was in apparently proven territory. This was early in September, 1928. He was then asked and gave answers, with respect to when he first thought he was not getting fair settlement on his market price leases (note of evidence, p. 134) as follows:

"Q. Now, Doctor, when did you first get the idea, or information, or opinion, or whatever it was, that you were not getting fair settlement under your leases that provided for payment of royalties on the basis of the market value of the gas at the well? A. Well, I don't recall just when it was, but it was after the pipelines got there and I heard of other people receiving more for their gas than I was, and the different things which was the basis of it. I think it was somewhere along in 1929 or '30, possibly the last of '29.

"Q. When did you first begin to hire a lawyer to represent you in claims that you had and might have against the gas companies for unjust treatment that they were giving you in the matter of operating your properties and settling with you? A. I don't recall just when it was. It was, I think somewheres around possibly 1930 or maybe it could have been '31. I don't recall just when it was."

As a witness he acknowledged signing an agreement in 1932 for the employment of his present counsel, in which it was recited that the latter, with one Judge John R. MacIntosh, were employed in March and April 1931, to prosecute claims for a better price than he was getting. He was then asked and answered questions (note of evidence, p. 140) as follows:

"Q. What dissatisfaction did you have in March and April of 1931 with the sum paid you for gas taken from your lands? What was your dissatisfaction, and what was it based on? A. Well, I didn't know what the market price was, and I knew there was other people in the field that was getting more for their gas than I was getting for mine, and I couldn't see why when my contract called for market price that my sales weren't bringing me as much as these others that was getting more than I was."

The witness later testified that he had reason to believe, prior to his employment of counsel, that the pipelines were paying more for gas. Additional portions of his cross-examination are (note of evidence, p. 144) as follows:

"Q. What other effort did you make to ascertain the price at which gas was being sold at higher prices than 3 cents to the pipeline company than having Mr. Bullis look it up and— A. (interrupting) Well, I have talked to Mr. Melton in regard to it. I never could get any information. He always claimed it was market price. In fact I knew of no way to determine that.

"Q. Then up to the time you employed Mr. Bullis you contented yourself that you were being paid fair market price and made no effort to find out, is that correct? A. I didn't know I should go out and find out.

"Q. Did you ever make any complaint to the United Gas Public Service Company? A. I made it to Mr. Rogers and Mr. Melton. (employees of defendant)

"Q. What complaint did you make to them? A. That I didn't think I was getting fair market price.

"Q. You did that? A. Yes.

"Q. Mr. Melton is dead, isn't he? A. I understand he is.

"Q. Mr. Rogers lives in Monroe? A. I think so.

"Q. When did you make such complaint to Mr. Rogers? A. It was when he had an office here in Monroe, I don't remember, possibly the first of 1930 or '31.

"Q. That complaint was based on the belief that Bob Rhymes was getting more than you were, was it not? A. Not altogether.

"Q. Did you ever complain to Mr. Rogers that you were not getting paid a fair value for your royalty on account of your belief that the pipeline sales were at higher prices? A. I made complaint that I wasn't—to Mr. Rogers that I wasn't getting the price that others in the field was getting, and that I had a market price contract, and that I figured that I wasn't being paid for the gas at as high a price as others was in the field.

"Q. The only complaint that you really made was that you were not getting as much royalty, or as good a royalty base as other land owners, isn't that true? A. Well, that is practically so.

"Q. When you made that complaint you did not complain about pipeline prices because you did not know them? A. I didn't know what the pipeline prices was.

"Q. Did you complain to Mr. Rogers about the pipeline prices? A. I don't recall whether I mentioned that or not.

"Q. Now then, Doctor, you state that as early as March or April of 1931 that you had reason to believe that you were not getting what you were entitled to in the settlement on your land, is that correct? A. How was that?

"Q. I say, as early as March and April, 1931, you believed you were not getting payment of what you were entitled to in settlement of your royalty, and that you thought you were entitled to more? A. I think so.

"Q. And you thought so in 1930 and '31, did you not? A. Yes.

"Q. Notwithstanding that at all times beginning in 1930 and 1931, and there after, you had reason to believe, and did believe that you were not getting what you were entitled to in settlement of your royalty, you accepted the statements and checks that were issued to you in full payment of the amount due you, did you not? A. I accepted them, yes.

"Q. You did that each and every month under each and every lease that you owned on which gas was being produced that the United Gas, or its predecessor companies, operated, did you not? A. I did.

"Q. Could you tell me when you first complained to Mr. Rogers? A. I think it was sometime in 1930, possibly the last of 1929."

On re-direct examination, the witness was asked and answered (note of evidence, p. 156) as follows:

"Q. Doctor, counsel has developed under cross-examination that you acquired some royalties, exchanged some royalties, executed leases in the Richland gas field, and so on. I will ask you now specifically if you have ever had any experience whatever in the production, purchase or sale of natural gas? A. I have not.

"Q. As the production and sale of natural gas from your leases was in progress what source, or sources, of information did you have as to its sale price, or market value, except through such information as the producers might communicate to you? A. None.

"Q. What information did they communicate to you concerning the sale price, or market price, from the time of the execution of these division orders assigning the Magnolia sale on the 28th of September 1928, until the date on which they produced records of their sales in this Court on the trial of the first hearing of this case in November of 1932? A. None.

"Q. Is there such a thing as a posted price for gas that you can buy and sell daily like you would in the oil business in the Richland gas field? A. Not that I know of.

"Q. Into what market has the bulk of the production in Richland gas field gone? A. How is that?

"Q. Into what market has the bulk of production in the Richland gas field gone? A. It is sold into the pipeline."

Again on cross-examination, the witness was asked and answered (note of evidence, pp. 157 to 159) as follows:

"Q. You stated, Dr. Pardue, that the bulk of production went into pipelines? A. That is my understanding, yes, sir.

856

"Q. That was true from the beginning when the pipelines were constructed beginning 1928, 1929, 1930? A. I think so.

"Q. From then until now? A. Yes.

"Q. You knew that your gas was being sold into these pipelines? A. Yes.

"Q. Did you ever ask anyone what the pipelines were paying for the gas? A. Well, I have asked—I did not—

"Q. (Interrupting) Answer my question, Doctor! Did you ever ask anybody? A. Sure, I have asked, inquired around.

"Q. Did you ever ask any officer or representative of the defendant company what the pipeline price of gas was? A. I don't recall whether I asked the officers of the company, but I—

"Q. (Interrupting) Wait a minute! Answer my question! I want a response to that question, whether or not you asked any officers or representatives of the defendant company what the pipelines were paying for gas? A. I don't recall.

"Q. You would not say that you have asked any officer or representative that question, do you? A. I don't recall that. I have talked with them about market price, I am sure, but I don't recall that direct question when I was talking with them.

"Q. You testified a while ago that you talked to Mr. Rogers and Mr. Melton, who is dead; those are the ones that you refer to? A. Yes, they are the ones we went to.

"Q. But you do not recall having asked anyone what the pipeline price was? A. I don't recall whether I asked that direct question or not. I have talked with them about the price, that I didn't figure I was getting market price, but I wouldn't say I asked them the direct question what the pipelines was paying. I wouldn't make that direct statement."

On re-direct examination (note of evidence, p. 160) as follows:

"Q. It is a fact. Mr. Melton was present in the courtroom throughout the entirety of the other trial, is it not? A. I think he was. I don't remember that exactly."

Finally on cross-examination (note of evidence, p. 161) as follows:

"Q. You did not state in your former testimony in 1932, when Mr. Melton was in the courtroom and alive, that you made any such complaint to him, did you, Dr. Pardue? A. Well, I don't remember whether that question was asked me or not. I think the written testimony would show better on that."

Thus it appears, from his own testimony, the plaintiff is a man of experience and intelligence. My belief is that the record not only fails to show that he was ignorant of the fact that the defendant and its predecessors were selling gas to the pipelines for more than they were paying him, but that he had every reason to believe that they were doing so, and he had ascertained facts putting him on guard at least as early as 1930. In this situation, if he thought he was entitled to pipeline prices, as his attorney has insisted all the way through, in view of his contractual relations under the lease with the defendant as lessee, he could have filed a bill of discovery and compelled the disclosure of these prices as the basis of a suit, which he could have later filed. Notwithstanding the fact that he had contended this was true, his first suit was filed (according to the insistence of his counsel) to force this disclosure on August 3, 1931, and these pipeline prices were not actually known until the trial on November 21, 1932. Conceding for the moment, that lack of knowledge of the pipeline contracts was sufficient to avoid the running of prescription, it is my view that according to his own testimony, the circumstances were such that he must be held to have been required to commence his action at least by the end of 1930. However, can it be said that lack of knowledge of these pipeline contracts was sufficient to prevent prescription from running? It was first held in the case of Arkansas Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924, 928, that these contracts, or the prices at which gas was sold to the pipelines were not admissible in evidence; but in the subsequent case of Sartor v. United Gas Public Service Co., 5 Cir., 84 F.2d 436, the Court of Appeals carefully reviewed the matter, and I believe, came to the view which this Court had originally entertained, that is, if there was no market price in the field at the well, or evidence to establish it there, then such contracts could be received, with proper instructions as to the various elements entering into the pipeline prices to show the *value of the gas at the well.* In other words, in effect, that although they were

secondary evidence, they should be allowed to go to the jury along with all other proof in the case, so that if they should find, as a matter of fact, that there was no market at the well, they could determine the value at that point. Under such circumstances, can it be said that defendant took advantage of plaintiff, or that a fraud was committed by not recording these contracts in the conveyance records or by the failure to voluntarily inform the plaintiff that the defendant was selling the gas to the pipelines for a better price? I do not believe so. In any event, two jurys have heard the same facts; they first fixed the price at 4.45¢, and the second at 4¢ per thousand cubic feet. Another jury recently found in this Court, on substantially the same evidence, that the 3¢ paid was the market price and rejected the demands of the lessor entirely in a similar case. The Supreme Court of the State, which has authority to review the facts, has found that 3¢ was the fair market price in the Richland field. Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103.

I am convinced, therefore, that there is no substantial evidence in the record to support the burden of proof resting upon plaintiff to show that prescription did not begin to run or was interrupted from the time the amounts alleged to be due for the gas had accrued, and that it was my duty to instruct the jury accordingly.

The figures given at the beginning of this opinion show that the first suit was for a total of 1,009,580,000 cubic feet produced in 1930 and 1931, which was well within the three year period when it was filed on August 31, 1931, and hence the demand was barred by prescription. As to the second suit, 2,955,664,000 cubic feet were produced in 1928 and 1929, and any claim therefor had prescribed when it was filed on January 10, 1934, leaving only the 612,798,000 cubic feet produced in 1932, upon which a recovery can be had.

As to the plea of accord and satisfaction, I am of the view that it cannot be sustained, whether I have the power to grant a new trial at this time or not. Up to the filing of the first suit, the record does not show that the matter had reached the point where the parties had actually engaged in a dispute as to what was claimed by the plaintiff on the one hand, and as to what was contended by the defendant on the other, as market price. The latter had simply continued to mail the checks to plaintiff, who received and cashed them. They did not state on the face that they were actually to be in payment of market price, although this was the inference to be drawn therefrom. Plaintiff was certainly entitled to be given something for his gas and I do not believe by accepting what he believed to be only a part of that value, if a higher figure was actually due, it can be said to constitute an accord and satisfaction within the purview of the decisions cited, where the circumstances were greatly different. In those cases a clear dispute had arisen in which one side demanded more and the other insisted that a lesser figure was due, and in the face of that situation, the person to whom the money was paid accepted it with definite knowledge that the other would insist it would be full payment. After the suit was filed, this was a continuing notice to the defendant that the plaintiff was asserting and would insist that these payments constituted only a partial settlement and should be credited on what he was demanding.

My conclusion is that the plea of prescription should be sustained to the extent indicated and the motion for a new trial should be over-ruled.

Proper decree should be presented.