ODOM, Justice.
 

 S. R. Parker and Onie McDonald were married on January 8, 1905. Eleven children were born of the marriage, the first on June 9, 1906, and the eleventh on September 28, 1919. Certain real estate was acquired during the marriage, which fell into the community. Mrs. Parker died intestate on March
 
 7,
 
 1922, and her community interest in the property was inherited by her eleven children, all of them being minors at the time of her death.
 

 S. R. Parker was confirmed as natural tutor of his minor children on October 9, 1922, and letters of tutorship were issued to him according to law. S. R. Parker remarried on November 22, 1922, and thereby forfeited the usufruct of the property belonging to the minors.
 

 On February 19, 1919, which was prior to the death of his wife, S. R. Parker executed an oil and gas lease covering the land which belonged to the community. The lease was executed in favor of J. E. Smitherman,who assigned it to the defendant. The lease contract contained the usual one-eighth royalty clause, and as to oil it was provided that one-eighth of all saved should be delivered as royalty to S. R. Parker, free of expense, “such delivery to be made either in tanks with connection by lessor provided, or into any pipe line that may be connected with the well”.
 

 The defendant company drilled a number of wells on the land, some, if not all, of which were producers of oil. These wells have produced oil continuously from the date on which they were brought in to the date on which these suits were filed in March or April, 1938.
 

 In October, 1922, S. R. Parker, tutor of the minors, executed certain so-called transfer and division orders, the effect of which was to credit the minors with their pro rata shares of the royalties.
 

 There is in the record a statement of facts agreed to by counsel, which shows that these transfer and division orders together cover production from all the property described in the S. R. Parker lease, there being several tracts, a transfer or division order executed to cover the division on each tract. In Paragraph
 
 7
 
 of this agreed statement there is the following stipulation:
 

 “ * * * it is conceded that there has been paid to S. R. Parker, Tutor, the value of all production according to the total interest of these Plaintiffs, together with that of Novice Gay Parker [who was emancipated by marriage], by checks payable to the order of, ‘S. R. Parker, Tutor’ and by him endorsed, ‘S. R. Parker, Tutor’, thus cashed and the money received therefor.”
 

 Paragraph 9 of the agreed statement shows that the total amount of oil produced from the S. R. Parker lands since
 
 *903
 
 June 9, 1927, which was the date on which the oldest child reached majority, .was disposed of in the following ways:
 

 “First, the oil was sold directly to a third party and run directly to the purchaser’s pipe line; or,
 

 “Second, the oil was gathered by The Ohio Oil Company [Defendant here] and placed in its own storage tanks.”
 

 The price of the whole amount sold was received trom the purchaser by the Ohio Oil Company, who in turn paid to S. R. Parker, tutor, each month the value of that part of the oil sold which accrued to the interest of S. R. Parker’s children. Where the oil was gathered by the Ohio Oil Company and placed in its own storage tanks, the company paid to S. R. Parker, tutor, each month the value of the oil stored which accrued to the interest of his children for the preceding month.
 

 The agreed statement and the pleadings show that, although all of the children had reached majority at the time this suit was filed, except one who was emancipated by marriage, the father had made no settlement with them and had never paid any one of them his or her pro rata share of the proceeds of these royalties. In fact, the agreed statement shows that “no account of any nature or discharge has been had in the tutorship proceedings, but that said tutorship proceedings are still open and the Letters of Tutorship issued to S. R. Parker have never been revoked or cancelled”.
 

 Ten of the children each brought a suit against the Ohio Oil Company, alleging substantially the above facts, to recover approximately one-eleventh of one-half of the proceeds of these royalties collected by their father subsequent to the. dates on which the petitioners reached the age of majority. Their suits were consolidated for the purpose of trial and appeal.
 

 Plaintiifs do not allege that the proceeds of the royalties which they now claim were paid to their father, S. R. Parker. The fact that their father collected what was due them appears from the agreed statement of facts and from the answers filed by defendant. Plaintiffs merely allege that the oil was produced from lands in which they own an undivided interest, and that defendant ■ has used or disposed of all of the oil but has failed and refused to render unto them an accounting or to pay them their shares.
 

 Plaintiffs pray for an interlocutory decree “ordering defendant to produce and file herein a statement showing the quantity of oil produced, saved and taken from the leased premises herein described from the beginning of production to date and the price received for the same or its value at prevailing prices as and when produced, saved and taken, and for final judgment against defendant in a sum equal to” petitioners’ pro rata shares of the proceeds.
 

 The defendant filed an exception of no cause of action, a plea of estoppel, and plead prescription of three years under Article 3538 of the Civil Code. The exception of no cause of action and the plea of estoppel were overruled, but the plea of prescription was sustained. There was judgment in favor of each of the plaintiffs, and against the defendant, for his pro rata
 
 *905
 
 share of the proceeds of these royalties during the three years immediately preceding the date of the filing of the suits. The plaintiffs and the defendant appealed.
 

 The admitted facts in this case are as above stated. -These plaintiffs are not demanding their pro rata shares of the proceeds of oil royalties which accrued prior to the dates on which they reached the age of majority. They concede that their father, as their tutor, had authority under the law to collect and grant full acquittance for all royalties .from the oil wells which accrued during their minority. Their theory is, and they now contend, that the tutorship as to them ended when they reached the age of twenty-one years, and that thereafter their father had no right to collect for them that portion of the rentals to which they were entitled, and that the payments to him thereafter by the oil company, being unauthorized, did not relieve the company of its obligation to them. They admit that the oil company was never formally notified by them or anyone else that they had reached the age of majority and that payments thereafter to the father were unauthorized, and admit that no demand was made for payments to them until the year 1938, when their suits were filed. Their counsel argue that, under the circumstances disclosed by the admitted facts, no such notice or demand was necessary. We shall discuss this point when we reach the plea of estoppel.
 

 The exception of no cause of action filed by defendant is grounded upon the theory that, in as much as plaintiffs have never demanded of their father a • settlement of the tutorship affairs, no cause of action has arisen in their favor against it to recover the amounts claimed, even if it be admitted that the amounts claimed were erroneously paid to the father. In other words, defendant’s argument, in effect, is that plaintiffs’ suits against it are prematuré.
 

 In support of this particular point counsel for defendant seem to rely mainly on McHugh v. Stewart, 12 La.Ann. 361, and Gibbs v. Lum, 29 La.Ann. 526. McHugh v. Stewart holds that the tacit mortgage of a minor,on the property of the tutor for the balance due him cannot be enforced until an account of the tutorship is rendered by the tutor or the amount due is ascertained by judgment in default of the rendition of an account, and that a tutor himself cannot assert this tacit mortgage upon property affected by it in his hands and which he has alienated or incumbered in favor of third persons. In Gibbs v. Lum it was held:
 

 “An heir who has attained majority can not subject any part of his tutor’s property to the legal mortgage he may have on it, until he has first obtained a judgment of liquidation and settlement of his claims against the tutor.” (Paragraph 2, Syllabus.)
 

 These cases have no application here.
 

 The question here is whether one who was, during his minority, represented by a tutor may, on reaching the age of majority, sue to collect a debt due him by a third person without -first provoking a settlement of the tutorship affairs, in a case where
 
 *907
 
 the debt sued for arises subsequent to the date on which he becomes of age.
 

 Tutorships are created by law. A tutor has no authority, no rights, no duties except those which are conferred and imposed by the law. The relationship which exists between a tutor and his ward is created by law. And, since only minors who are not emancipated are placed under the authority of tutors (Civil Code, Article 246), it follows that acts done after the termination of the legal relationship of tutor and ward are not tutorship acts. A tutor as such, by virtue of the power and authority vested in him by law, acts for, and represents, his ward in all matters in which his ward has an interest. But, when the tutorship is ended as a result of a legal status attained by a former'ward, he must thereafter represent himself in matters pertaining to his personal interest, or go unrepresented. His former tutor can no longer represent him legally by virtue of the authority he once had.
 

 Article
 
 37
 
 of the Civil Code says that:
 

 “Minors are those of both sexes, who have not yet attained the age of one and twenty years complete; and they remain under the direction of tutors till that age.”
 

 In so far as the tutor’s authority over the minor and his affairs is concerned, the tutorship, and therefore the authority conferred by it, is at an end when the minor reaches the age of one and twenty years or is otherwise released, in a manner prescribed by law, of the disabilities attached to minors.
 

 We can think of no reason—and none has been suggested—why one who has reached the age of majority or who has been emancipated for all purposes should be driven to the necessity of provoking a settlement with his former tutor touching matters relating solely to the tutorship as a condition precedent to his taking steps to protect his rights against third persons relating to matters which arise after his majority or emancipation.
 

 Counsel have cited neither codal provisions nor cases which support their position. But there is authority to the contrary. See Eby v. McLain, 123 La. 138, 48 So. 772. The rule stated in 28 C.J. p. 1250, Sec. 433, is that “After termination of the guardianship the ward may recover money or property belonging to the estate in whosesoever hands it may be,” citing Eby v. McLain, supra, among others.
 

 The rule that a minor on reaching his majority cannot subject the tutor’s property to his tacit mortgage without first having his claim liquidated by settlement of the tutorship affairs is well established, and we do not hold against it. • That rule has no application here.
 

 As we have stated already,, after these plaintiffs reached majority, they did not notify defendant of that fact, did not notify it that their father had no further authority to represent them because the tutorship was at an end, and made no demand for payment to them direct. Nor did they complain to their father that he was exceeding his authority. They neither said anything nor did anything, but sat idly by and permitted their father and
 
 *909
 
 former tutor to collect, as “tutor”, the amounts which they now claim should have been paid to them. Because of their conduct in this respect, defendant filed the special plea “that all of the plaintiffs are barred and estopped to claim from or to sue The Ohio Oil Company for any part of the sale price or value of any of the oil produced, saved and/or marketed from the S. R. Parker farm”.
 

 The trial judge overruled the plea of estoppel. His ruling was correct. It was not alleged, and it is not now contended,' that these plaintiffs committed any affirmative act, that they did anything, to mislead defendant, or that they intended to mislead it.
 

 The basis of the estoppel plead in this case is that plaintiffs said nothing, did nothing, were silent, inactive, during all the time defendant was paying to their father that which they now claim was due them. In other words, defendant’s plea is that these plaintiffs are estopped by “standing by”.
 

 A discussion at large of the rules applicable to estoppel would subserve no useful purpose here. ' It suffices to say that there is ample authority to support the general proposition that silence and inaction may, under some circumstances, work an estoppel. This is based upon the theory that, if a man is silent when it is his duty to speak, “equity will debar him from speaking when conscience requires him to be silent”.
 

 ' But the rule is subject to qualification. “Mere, silence will not work. an estoppel. There must be some other element connected with the transaction and the silence to prevent a person from asserting his rights or claim. * * * But to effect an estoppel by silence it must also appear that the person had a full knowledge of the facts and of his rights, that he had an intent to mislead, or at least a willingness that others should be deceived, and that the other party was misled by his attitude.” 10 R.C.L., Sec. 21, pp. 692, 693.
 

 “Mere silence of itself will not raise an estoppel. To make the silence of the party operate as an estoppel the circumstances must have been such as to render it his duty to speak, and there must also be an opportunity to speak. And it is essential that he should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and have been misled into doing that which he would not have done but for such silence.” 21 C.J., Sec. 154, p. 1150. See, also, 16 Cyc. 759; Amer.Juris., Vol. II, Sec. 232, p. 186.
 

 “As a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct of representations of the party sought tó be' estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in controversy, but should have also been without convenient or ready means of acquiring such knowledge. A public record is an available means of information as to questions of title, and one who does not take advantage of it cannot claim an estoppel against one who
 
 *911
 
 merely fails to furnish such information.” 16 Cyc., pp. 738, 740.
 

 See, also, Haley v. Woods, 163 La. 911, 113 So. 144.
 

 Keeping in mind the above general legal principles and the pertinent facts presented by the record in these cases, we must hold that the plea of estoppel is not well founded.
 

 In the first place, it is not shown that plaintiffs possessed knowledge either of their rights or of the facts. Estoppel is an affirmative plea, and. he who makes the plea and relies upon it carries the burden of establishing the facts to support it. If, as a matter of fact, plaintiffs did know their rights and all the facts, it was the defendant’s duty to make the proof. There is nothing in the record to show whether the plaintiffs are uneducated, ignorant people or whether they are educated and understand business affairs generally. We cannot assume that they knew the facts, much less their legal rights. Cases of this kind as regards one’s legal rights involve law points of which even educated people not versed in the law ordinarily have no knowledge.
 

 Those who are ignorant of their legal rights, even if they know the facts, are not estopped by silence, by “standing by”. A man is under no duty to speak when he does not know that his silence may so mislead another man as to inflict injury upon him.
 

 In the second place, it cannot be 'said that the defendant in this case was ignorant of the truth. Where the' basis of the plea of estoppel is the silence and inaction of the party against whom the plea is made, the plea is unavailing unless the one making it is ignorant of the truth, “destitute of knowledge of the real facts as to the matter under controversy”. Not only that, he “should have also been without convenient or ready means' of acquiring such knowledge”. “A public record is an available means of information as to questions of title, and one who does not take advantage of it cannot claim an estoppel against one who merely fails to furnish such information”. 16 Cyc. 738; see, also, Haley v. Woods, supra.
 

 Those in charge of defendant’s business and operations knew that they were dealing with S. R. Parker in his fiduciary capacity, as tutor. The public records were open and available to them. These records, the tutorship proceedings, not only show that S. R. Parker was confirmed as natural tutor for his eleven minor children, but show the date on which each was born. If , they had consulted these records, they would have found that the first child was born on June 9, 1906, and therefore reached the age of majority on June 9/1927; that the second was of age on July 21, 1928, and so on down the list.
 

 But, even if it be true, as counsel contend, that it was not their duty to go to the records (we think it was, under the circumstances), the letters of tutorship on which they rely as authority for paying these amounts to S. R. Parker, tutor, were sufficient to put them on guard. These letters were dated October 9, 1922, and for
 
 *913
 
 nearly sixteen years thereafter they paid these royalties to “S. R. Parker, Tutor”. They had no right to assume that Parker’s tutorship of all eleven of his children continued for that length of time. Even if they did not know how many children there were, they did know that they were dealing with Parker as tutor, in which capacity he could not continue indefinitely. They were negligent in sitting idly by and making no investigation.
 

 Speaking of the duty of a third person to ascertain the extent of an agent’s authority, it is said in Volume II, p. 76, American Jurisprudence, that one dealing with a known agent “is not authorized under any circumstances blindly to trust the agent’s statements as to the extent of his powers; such person must hot act negligently, but must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers”.
 

 The principle applies with equal, if not greater, force to one who deals with another as “tutor”, especially when the documents, the letters of tutorship, with which he is familiar show that the tutor was confirmed years before the dealings took place.
 

 What the Supreme Court of Arizona said in Brutinel v. Nygren, 17 Ariz. 491, 154 P. 1042, L.R.A.1918F, 713, as to the duty of one dealing with an agent is applicable to those dealing with tutors. We quote [page 1045]:
 

 “The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and like a railroad crossing suggests the duty to ‘stop, look, and listen,’ and if he would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon him to establish ft. In fine, he must exercise due care and caution in the premises.”
 

 Originally- S. R. Parker was authorized by virtue of the tutorship to collect these rentals. The law gave him authority to administer the affairs of the minors. But that authority ceased when the minors reached the age of majority. His legal mandate was then at an end. It stood revoked by virtue of the law itself. The administration thereafter was a matter of sufferance on the part of these plaintiffs. They did not put into effect their powers on coming of age, and under such circumstances, according to French authority, “the administration is prolonged by virtue of a tacit mandate and is consequently regulated by such principles” Hue, Articles 312-315, Vol, 3.
 

 This principle is relied on by counsel for defendant. But defendant is in no position to invoke the doctrine of tacit mandate because it had the means of knowing the truth, of knowing the limitation or lack of the agent’s authority. It had sufficient information to put it on guard, as we have already explained. The letters of tutorship dated in 1922 were themselves “danger signals”, sufficient to cause any prudent person to “stop, look, and listen.”
 
 *915
 
 Brutinel v. Nygren, supra. Defendant’s agents were negligent.
 

 “Payments in general can legally be made only to the creditor, or some one empowered by him.” Civil Code, Article 2145. These payments were not made to the creditors or to anyone empowered by them. The defendant is therefore not relieved. The exceptions to the general rule specified in the above article of the Code as to payments in good faith to one who really is not the creditor have no application to á case like this one.
 

 On the Plea of Prescription.
 

 The defendant plead prescription of three years under Article 3538 of the Civil Code in bar of all claims arising more than that length of time prior to the date of demand. It is unnecessary to discuss this plea further then to say that this case is not distinguishable from the case of Board of Commissioners v. Pure Oil Co., 167 La. 801, 120 So. 373, which we reaffirm. It was there held that the three-year prescription under Article 3538 of the Civil Code relating to arrearages of rent is applicable to an action to collect oil royalties.
 

 Counsel for plaintiffs in the present cases have designated these suits as actions “for an accounting of money had and received”, and argue that the prescriptive period of ten years under Article 3544 of the Civil Code is applicable and not that of three years under Article 3538. They say that these cases are like the case of Da Ponte v. Ogden, 161 La. 378, 108 So. 777.
 

 Counsel are mistaken. The issue involved in these cases is precisely the same as that involved in the Pure Oil Co. Case. In the Pure Oil Co. Case, the lessor had not received the oil royalties or the proceeds thereof due him under an ordinary oil lease.
 

 As shown by the court’s statement of the issues involved in that case, the suit was one to collect “the balance of the proceeds of royalty oil”, [page 375.] That is what these plaintiffs are demanding, the proceeds of royalty oil. This suit involves an accounting in the sense that defendant is called upon to make up a statement showing the amount of oil extracted from the land and the value of it as of the date extracted. That would be necessary in any case where a suit is brought to collect an amount due as proceeds of royalty oil, because a plaintiff, the lessor, could not be expected to know the amount of oil extracted or its exact value at the time extracted. These plaintiffs alleged that they had never received any of the proceeds of the royalty oil, the amount of which they did not know and which they alleged “cannot be determined without a full disclosure of the whole quantity of oil thus produced, saved and' taken, and the amount received therefor or its value at prices prevailing as when produced, saved and taken, which information defendant has and plaintiff has not”.
 

 In sum, the complaint made by these plaintiffs is that they have not received the fruits of their lease, the rentals due them, and they now demand that they be paid their pro rata shares of these rentals.
 
 *917
 
 That is what the plaintiff in the Pure Oil Co. Case demanded, and it was there held that the three-year prescriptive period was applicable. The plaintiffs are not entitled to the benefit of the ten-year prescriptive period as provided by Article 3544 of the Civil Code merely because they have demanded that defendant furnish a statement showing the amount of oil produced and its value. They, cannot be permitted to reap the benefits of the longer prescriptive period merely by calling their suit one for an accounting. The case of Da Ponte v. Ogden relied on by plaintiffs has no application here.
 

 In that case plaintiff demanded “an accounting of all funds received by the two defendants * * * . from said lands since November 9, 1915, by way of royalties for oil or other minerals, or bonuses, or rentals under leases or otherwise, or resulting from sale of timber or other products from the said land”, and defendants were “ordered to render an account of all the funds received by them * * * and to pay the plaintiff the one-sixth of the amounts so received after deducting all sums spent for taxes or other necessary and proper expenses for the preservation- and development of said property”.
 

 In the Da Ponte Case the only prescription plead was that of ten years' under Article 3544 of the Civil Code. Three-year prescription under Article 3538 was not mentioned. The reason is obvious. Plaintiff sued the Ogden heirs to recover a one-sixth interest in certain lands and to compel them to execute a title therefor. The lands involved were at the time the suit was filed, and had been for a number of years, in possession of the Ogden heirs, the defendants. Parkerson, their agent and attorney, had charge of, and looked after, the lands for them. The court said that “For a period of some seven or eight years Parkerson collected oil royalties and proceeds of timber sales from the lands embraced in both judgments, and paid one-sixth thereof to Da Ponte”. The payments were made to Da Ponte because Parkerson considered that Da Ponte owned a one-sixth interest in the lands. But in November, 1915, a spokesman for all the Ogden heirs notified Parkerson to make no further payments to Da Ponte. The request was complied with, and, although Parkerson continued to collect “royalties from these lands”, he made no payments to Da Ponte from November, 1915, to April, 1916. In April, 1916, one of the Ogden heirs took over personally for herself, and her co-heirs the collection and distribution of the rents and royalties, but paid Da Ponte nothing. Da Ponte was finally recognized by the court as owner of a one-sixth interest in the lands, and claimed his pro rata share of all sums, including oil royalties, proceeds of timber sales, bonuses, or rentals under leases or otherwise, collected by the Ogden heirs during the time they had possession of the land. So that the Ogden heirs, while in possession of the property and while exercising dominion over it, collected the royalties, sold timber and collected for it, and appropriated the entire amount received to their own use and refused to account to Da Ponte for his one-sixth of the proceeds thus derived.
 

 
 *919
 
 The court characterized the demand as “a real action in so far as it seeks to recover an undivided interest in the lands” and as a personal action “in so far as it calls on defendants to account for and pay over one-sixth of the
 
 royalties received from said land”.
 
 (Italics ours.)
 

 We italicize this part of the quotation to bring out the point that the court was considering a case where the defendants were in possession of another’s property, derived revenues from it, and had “received” the rents — a case where the relationship of lessor and lessee did not exist between the plaintiff and the defendants, a case where the demand was “for the return of money had and received” by defendants as rentals paid by third persons. Da Ponte had not leased his land to the Ogdens for the production of oil, and there were therefore no “rents” or “royalties” due him under a lease.
 

 In the Pure Oil Co. Case the situation was entirely different. There the plaintiff had leased its lands to defendants for the production of oil, and, in case any was found, the lessor, as consideration for the lease, was to receive one-eighth of it as royalty. Following the case of Logan v. State Gravel Co., 158 La. 105, 103 So. 526, where it was held that lands adapted to mining may be leased for a certain portion of the produce of the mine and the fact that such portion is called “royalty” instead of rent “is not of the least consequence” [page 527], we held that the royalties due under thé lease were in the nature of rents and for that reason an action to recover them was prescribed by three years, as provided in Article 3538 of the Civil Code.
 

 We adhefe to the ruling in the Gravel Co. Case and that in the Pure Oil Co. Case.
 

 The Da Ponte Case was not mentioned in the Pure Oil Co. Case, although decided nearly three years before. Apparently neither the court nor counsel thought the ruling in the former case had any application to the issue involved in the latter.
 

 The trial court sustained the three-year prescription.
 

 The judgment appealed from is affirmed in all parts.
 

 FOURNET, J., concurs.