**INEXCO OIL COMPANY**

**v.**

**CRUTCHER–TUFTS CORPO-RATION et al.**

**Civ. A. No. 17458.**

United States District Court,
W. D. Louisiana,
Opelousas Division.

Feb. 7, 1975.

---

Blake G. Arata and John M. Mc-Collam, Gordon, Arata & McCollam & Watters, New Orleans, La., for plaintiff.

Claude E. Hall and John C. Christian, Milling, Saal, Benson, Woodward & Hillyer, New Orleans, La., for defendants.

NAUMAN S. SCOTT, District Judge:

OPINION

Plaintiff, Inexco Oil Company, (hereinafter referred to as "INEXCO"), seeks to compel specific performance of two Farmout Agreements executed by them with defendant, Crutcher-Tufts Corporation, and defendants, Albert B. Crutcher, Jr. and J. D. Tufts, II, (hereinafter collectively referred to as "CRUTCHER-TUFTS"), respectively, on July 30, 1970, affecting oil, gas and mineral leases held by the assignors and covering lands in the Reddell Field in Evangeline Parish, Louisiana, and more specifically to compel the assignment of certain mineral leasehold interests allegedly earned by plaintiff by the drilling of the Inexco-Pardee Company No. 2 well to a total depth at which it encountered domal material in accordance with provisions of the Farmout Agreements.

FINDINGS OF FACT

1.

Plaintiff, Inexco, is a Delaware corporation, with its principal place of business in Houston, Texas. Defendant,

Crutcher-Tufts, is a Louisiana corporation, with its principal place of business in New Orleans, Louisiana; defendants, Albert B. Crutcher, Jr. and J. D. Tufts, II, are citizens of the State of Louisiana. The matter of controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs.

### 2.

By two instruments, each dated July 30, 1970, Inexco and Crutcher-Tufts entered into Farmout Agreements affecting oil, gas and mineral leases held by Crutcher-Tufts and covering lands in the Reddell Field in Evangeline Parish, Louisiana, within the jurisdiction of this Court.

### 3.

Inexco sought the Farmout Agreements and suggested the objective depths stipulated therein.

### 4.

Crutcher-Tufts owned leases covering adjoining and offsetting acreage which were not made subject to the Farmout Agreements.

### 5.

The two Farmout Agreements (except for identification of the respective parties and leases subject thereto) were identical. Each Agreement provided that if Inexco:

(a) drilled a test well at a location the Northeast quarter of Section 20, T4S; R1W, to (1) a total depth of 14,000 feet below the surface of the ground, or (2) to a depth below 13,000 feet which penetrated not less than 500 feet of continuous shale, or (3) to a depth below the Wilcox Formation which encountered salt, anhydrite or other domal material; and

(b) completed the test well as a producer of oil or gas in paying quantities below the top of the Wilcox Formation; and

(c) caused a portion of the lands covered by the lease subject thereto to be included within a unit for the test well established by the Commissioner of Conservation for the State of Louisiana; and

(d) complied with all of the other provisions of the agreement;

all within 240 days from July 30, 1970 (that is March 29, 1971), Crutcher-Tufts would assign to Inexco the leases affected thereby, insofar as same covered lands included within such unit, and insofar as same applied to all depths below the top of the Wilcox Formation and above the stratigraphic equivalent of 100 feet below the total depth drilled in the test well, reserving to Crutcher-Tufts an overriding royalty of 5% of ⅝ of all oil, gas and other minerals produced and saved and allocable to that portion of the leased lands included within such unit.

### 6.

Each Farmout Agreement provided that any assignment of interests thereunder shall provide that upon the recovery of the costs out of the proceeds from production, as set forth in paragraph 4 of the agreement, or at the assignor's option, 35% of the leasehold interests previously assigned to Inexco would revert to the assignor, free and clear of costs and other burdens, and the reserved overriding royalty would simultaneously terminate.

### 7.

Under the terms of each Agreement, if the test well was drilled, completed and committed to a unit which included a portion of the acreage subject to the agreement, as therein provided, Inexco then had the right to drill subsequent wells to the same objective depth as required for the test well and, if productive in paying quantities below the top of the Wilcox Formation, the right to cause units to be formed for such wells by the Commissioner of Conservation; and, if not more than 180 days elapsed

between the creation of successive units including acreage subject to the Agreement, Inexco would earn the right to an assignment of those portions of the leases affected by each unit or units, subject to the same conditions, reservations and depth limitations as provided for the test well.

### 8.

In August of 1970, Inexco commenced drilling the Inexco-Pardee Company No. 1 Well in the Northeast quarter of Section 20, T4S, R1W on acreage other than the leased acreage subjected to the Farmout Agreements.

### 9.

The Pardee Company No. 1 Well reached its total depth of 12,946 feet on or about October 12, 1970.·

### 10.

After completing the Pardee Company No. 1 Well, but before a unit was created, Inexco drilled the Pardee Company No. 2 Well, which was also located on acreage other than the leased acreage subject to the Farmout Agreements.

### 11.

The Inexco-Pardee No. 2 Well reached its total depth of 13,687 feet on or about 1:00 A.M. on February 12, 1971.

### 12.

On February 15, the hole was cemented and plugged back to 12,895 feet. Inexco's decision to plug back and complete the well at shallower depths, rather than to continue drilling below 13,687 feet, was purely an economic decision, based in part upon an unwillingness to make the expenditures necessary to maintain control of the well while drilling below 13,687 feet.

### 13.

At the time of plugging back the Pardee Company No. 2 Well, neither that well nor the Pardee Company No. 1 Well had earned the assignment of any interest in the lease ssubject to the Farmout Agreements because neither of the wells had been unitized.

### 14.

On March 10, 1971, prior to any application for units for the Pardee Company Nos. 1 and 2 Wells, the Farmout Agreements were amended so as to extend the time for performance with respect to the test well to May 1, 1971 and to provide that Inexco need only to have made application to the Commissioner of Conservation for a unit for the test well which included acreage subject to the Agreements, rather than having to cause such unit to be created by that time. With respect to wells drilled subsequent to the test well, the amendments lengthened the 180-day limitation to 240 days.

### 15.

On March 29, 1971, Inexco made application to the Commissioner of Conservation to create a pattern of ten 640 acre units for each of the sands identified as the Upper Wilcox "B" Sand, the Middle Wilcox "F" Sand and the Lower Wilcox "D" Sand. A hearing was held, and as a result the Commissioner of Conservation issued Order Nos. 98–L, 98–M and 98–N, all dated June 3, 1971, creating nine 460 acre units for each of said sands.[1] The Pardee Company No. 2 Well was designated as the unit well for the Unit "B" created by each of said orders.

Each order provides that, in accordance with Section 10, Title 30 of the Louisiana Revised Statutes of 1950, each separately owned tract of land shares in

---

1. Subsequent to the institution of this action, the Commissioner of Conservation of the State of Louisiana, by Orders Nos. 98–L–1, 98–M–1 and 98–N–1, dated May 1, 1972, redefined said sands to include other and additional sand intervals and redesignated the same as the Upper Wilcox Zone, the Middle Wilcox Zone and the Lower Wilcox Zone, respectively.

unit production in the proportion that the surface area of such tract bears to the entire surface area of the unit in which such tract is situated.

16.

The Pardee Company No. 1 Well and the Pardee Company No. 2 Well each drained and produced from separately owned tracts and it was necessary for Inexco to unitize both wells. The amendments mentioned above allowed Inexco time in which to unitize the Pardee No. 1 Well but the delay for the commencement and completion of the Pardee No. 2 Well had not begun. The delay allowed for drilling a well following the test well (or a substitute) began with the date on which Inexco applied to the Commissioner of Conservation for its unit around the Pardee No. 1 Well.

17.

The Unit "B" created by Orders Nos. 98–L, 98–M and 98–N, issued by the Louisiana Department of Conservation, is comprised of 460.0015 surface acres. The Crutcher-Tufts Corporation acreage included within the unit comprises 23.-9718 acres entitled to 5.2113% of all unit production. The Albert B. Crutcher, Jr. and J. D. Tufts, II acreage included within the unit comprises 89.2770 acres entitled to 19.4080% of all unit production. This suit therefore affects 24.6193% of the unit.

18.

Inexco had Farmout Agreements with other parties owning leases under Units "A" and "B": and covering lands other than Pardee Company lands. Each of these agreements contained identical conditions for earning interests by the drilling of the Pardee No. 1 Well. The Crutcher-Tufts Farmouts differed from the other Farmout Agreements held by Inexco in that wells drilled subsequent to the completion of a test well had to comply with the same earning conditions as the test well and both the test well and subsequent wells earned only that leased interest which was included in any Unit. Thus, as to all interest except

the Crutcher-Tufts interest in the Pardee No. 2 Well, Inexco had already earned its interests by the drilling of the test well. The Crutcher-Tufts agreements were different and unique. Under the Crutcher-Tufts Farmout Agreements Inexco had to earn its interests in the Pardee Company No. 2 Well by drilling that well to the same requirements including objective depths, as were required in the test well and could earn only that portion of the Crutcher-Tufts interests which finally was included in the Pardee No. 2 Well Unit (Unit B).

19.

When Inexco completed the Pardee No. 2 Well, it was completely unaware of the conditions, obligations and requirements of the Crutcher-Tufts Farmout Agreements regarding that well. Inexco completed the well assuming that the Crutcher-Tufts interests, like the interests of the other parties with whom they had Farmout Agreements, had already been earned. The Pardee Company No. 2 Well was plugged back and completed in producing Sands of the Wilcox Formation for strictly economic reasons and no consideration was given to the need for satisfying the objective depth requirements in the Crutcher-Tufts Farmout Agreements.

20.

In response to Inexco's letter of October 18, 1971, requesting "the assignment that Inexco has earned under the terms of the Farmout Agreement from you to Inexco in the Reddell Field area", Crutcher-Tufts replied by letter of October 21, agreeing to assign the leases earned by the Pardee Company No. 1 Well but advising Inexco that it did not appear that the Pardee Company No. 2 Well had attained any of the objective depths specified in the Farmout Agreements. (See Finding 5, Paragraph a (1, 2 & 3).

21.

By its letter of November 1, 1971, Inexco asserted to Crutcher-Tufts that the Pardee Company No. 2 Well "en-

countered salt, anhydrite or other domal material at or near its total depth"; but Inexco furnished no supporting data, nor did Inexco specify what type of domal material it had encountered. That letter was the first communication by Inexco to Crutcher-Tufts claiming that the Pardee Company No. 2 Well encountered salt, anhydrite or other domal material.

### 22.

(a) Inexco was well aware of the fact that satisfaction of the objective depth requirement relating to domal material required objective and positive evidence usually in the form of cores and/or cuttings of such domal material and that production of such evidence was the common and ordinary method of satisfying the objective depth requirements such as those contained in Farmout Agreements like Inexco's Farmout Agreements with Crutcher-Tufts. They knew that the objective depth requirements had to be satisfied in the drilling of the Pardee Company No. 1 test well and adopted procedures to assure that such evidence would be available. They employed a three man mud crew which enabled them to time lag their mud samples and cuttings. They produced cuttings from the depth at which domal material was encountered. Had Inexco been aware of the fact, when drilling the Pardee Company No. 2 Well, that Crutcher-Tufts Farmout Agreements required the identical test well obligations and requirements as the Pardee Company No. 1 Well, they would have and should have made the same provisions for satisfying those requirements. But this was not done. Certainly the Court is entitled to see more than the opinions, deductions and theories of experts based, as in this case, on documentary evidence of limited quality and accuracy. Not one witness was produced who had analyzed any material product from the critical zone in the well, not even mud samples. The only witness who approximately qualified in this respect was the witness Bellaire, drilling engineer on the Pardee Company No. 2 well, who observed the hole at total depth but analyzed nothing and copied his mud analyses from the drilling mud reports. Professor Bercegeay, a petroleum engineer and Inexco's principal witness, never saw a sample of anything. This was not an omission on Inexco's part; there was simply nothing in Inexco's possession to analyze. This is not the quality of proof contemplated by the contract. It is certainly not of sufficient quality to satisfy this Court that domal material was encountered in the Pardee Company No. 2 Well.

(b) It is not sufficient for Inexco simply to show frailty in the conclusions of opposing experts. Crutcher-Tufts does not have the burden of proving that Inexco did not encounter domal material. The affirmative burden is on Inexco. Nor is it sufficient to show that the theories of Inexco's experts are relatively more probable. The contract does not require proof of probabilities. It requires proof that domal material was encountered.

(c) Expert opinion is only as reliable as the material upon which it is based. Obviously the records such as the daily drilling reports, the mud reports, and the engineer's daily report on the Pardee Company Well No. 2 were not compiled for the purpose of determining that Inexco had encountered domal material in the Pardee Company No. 2 Well. These reports, without exception are filled with inaccuracies, errors, self-contradictions and obvious approximations. The briefs and memorandums of the parties are repleat with discussion of these inaccuracies, the time they were made and what they mean. For instance, the report of the drilling engineer, Bellaire, on February 12, 1971 (P–23, B–Simmons–1) states in the "Log of Operations" section, the following: "Bottoms up—gas & salt water (6000 ppm. cl)". Mr. Bellaire, a plaintiff expert, testified that the words "salt water" were oil field jargon for "chloride contamination". There is nothing in the record to indicate that the other wit-

nesses understood this to mean chloride contamination rather than salt water, and certainly this could make a difference in their deductions. The Court is prompted to ask how Mr. Bellaire would express the event that salt water had been encountered if, in his opinion, this had been a fact. The opinions of the experts, particularly those of Professor Bercegeay, were most precise and endowed with pinpoint accuracy as if the reports upon which they were based had been made under controlled laboratory conditions. But these reports were not compiled for the purposes for which they are being used in this proceeding. They were compiled by operating personnel in the field whose principal duties were operational, the drilling and completion of the Pardee Company No. 2 Well. The reports probably are sufficient for field purposes. They are totally inadequate for the precise opinions given by the expert who relied upon them.

(d) Among the experts testifying in this proceeding were highly qualified petroleum engineers, geologists, drilling engineers, gravity experts, geochemists, geophysicists, paleontologists and seismologists. None of them were called to the well at the time total depth was achieved to determine whether or not domal material had been encountered. They had no cuttings, no cores, no electric log in the bottom 91 feet of the hole. Even the mud log was not time lagged. The reports available were sketchy and conflicting. It is beyond belief that they would not have required much more evidence and information had they been called on February 12, 1971 to determine whether or not Inexco had encountered domal material in the Pardee Company No. 2 Well. Inexco's engineer, Mr. Simmons, was not aware that the question of reaching the dome existed until Crutcher-Tufts refused to assign interests to Inexco on October 21, 1971, more than seven months after the well had reached total depth.

In this particular case the rank speculation is made necessary by the lack of reliable information and data. Inexco's responsibilities under the Farmout Agreements are explicitly defined. We cannot use this speculation to reduce the burden of Inexco's responsibilities under its Farmout Agreements simply because of Inexco's own failures. Inexco signed these agreements with Crutcher-Tufts, its office and field personnel should have been aware of its responsibilities. Admittedly they were not aware of the fact that they had to earn their interests under the Crutcher-Tufts Farmout Agreements. They did nothing to assure themselves that they would have evidence of encountering domal material, if, in fact, they did encounter it. Inexco should not be rewarded for its own inefficiency.

## CONCLUSIONS OF LAW

### 1.

This Court has jurisdiction over the parties and the subject matter in this controversy, under 28 U.S.C. § 1332.

### 2.

Plaintiff, Inexco Oil Company, seeks to compel specific performance of two Farmout Agreements executed by them with Crutcher-Tufts on July 30, 1970 affecting oil, gas and mineral leases held by Crutcher-Tufts and covering lands in the Reddell Field in Evangeline Parish, Louisiana, and more specifically to compel the assignment of certain mineral leasehold interests allegedly earned by them by the drilling of the Pardee Company No. 2 Well to a total depth at which it encountered domal material.

### 3.

It is conceded that the Pardee Company No. 2 Well was not (a) drilled to a total depth of 14,000 feet, or (b) to a depth below 13,000 feet which penetrated 500 feet of continuous shale. Inexco, as plaintiff, had the burden of proving that the Pardee Company No. 2 Well was drilled (c) to a depth below the Wilcox Formation which encountered salt anhydrite or other domal material.

### 4.

In this proceeding Inexco had the burden of proving that the Pardee Company Well No. 2 encountered domal material at or near its total depth. Crutcher-Tufts has no such burden. It does not have to prove anything. Therefore it is not sufficient for Inexco's proof to be simply more reasonable than the proof offered by Crutcher-Tufts. The Court here is not concerned with questions such as the adoption of one of two conservation units offered by opposing parties in a hearing before a State Conservation Commission. Such units satisfy their administrative and legal objective whether they are scientifically correct or not. For this reason they are often revised or, as in the case of Inexco's units in the Reddell Field, they were temporary.

The question before the Court cannot be considered in the abstract. It must be considered in the light of the contract because that question will be decided only for the purpose of determining the ultimate issue of Crutcher-Tuft's liability for an assignment of interest to Inexco.

### 5.

■ Although the Reddell dome exists in the vicinity of the Pardee Company No. 2 Well, Inexco's proof that it actually encountered domal material consists merely of theories and deductions made by experts from admittedly fragmentary incomplete records made by operating personnel during the drilling of the well. Not one witness was produced who had analyzed any material product from the critical zone in the well, not even mud samples. The only witness who even approximately qualified in this respect was witness Bellard who was the drilling engineer on the Pardee Company No. 2 Well who observed the hole at the time that total depth was reached but who copied his mud analysis from the drilling mud report. Professor Bercegeay, an engineer and Inexco's principal witness, never saw a sample of anything. This was not an omission on Inexco's part, there was simply nothing in Inexco's possession to analyze. This is not the quality of proof contemplated by the contract. It is certainly not of sufficient quality to satisfy this Court, that domal material was encountered in the Pardee Company No. 2 Well.

### 6.

Inexco did not earn the right to an assignment of any interests in leases held by Crutcher-Tufts by the drilling of the Pardee Company No. 2 Well.

### 7.

■ Inexco's claim that Crutcher-Tufts are estopped from asserting that the Pardee Company No. 2 Well was not drilled in accordance with the Farmout Agreements, because Crutcher-Tufts did not declare that they excluded the well as an earning well at the time of the execution of the March 10, 1971 Amendments to the Farmout Agreements, is without merit. Title to immovable property cannot be established by estoppel; and mere silence and inaction cannot result in divesting a party of title to immovable property. Chronos Land Co. v. Crichton, 150 La. 963, 91 So. 408 (1922); Dugas v. Powell, 207 La. 316, 21 So.2d 366 (1945); Dileo v. Dileo, 217 La. 103, 46 So.2d 53 (1950); Harrell v. Stumberg, 220 La. 811, 57 So.2d 692 (1952); Blevins v. Manufacturers Record Publishing Co., 235 La. 708, 105 So. 2d 392 (1958); Merritt v. Hays, 237 La. 557, 111 So.2d 771 (1959); Monk v. Monk, 243 La. 429, 144 So.2d 384 (1962); Ducros v. Couret, 82 So.2d 782 (La.App.Orl.1955); Wiggs v. Warren Realty Co., 106 So.2d 478 (La.App.Orl. 1959); Miller v. Barnes, 135 So.2d 555 (La.App. 2d Cir. 1962); Robichaux v. Pool, 209 So.2d 77 (La.App. 1st Cir. 1968). An estoppel cannot be shown by parol evidence to acquire title to interests in oil and gas leases. *See*, Wier v. Glassell, 216 La. 828, 44 So.2d 882 (1950); Little v. Haik, 246 La. 121, 163 So.2d 558 (1964); Hayes v. Muller, 245 La. 356, 158 So.2d 191 (1963); Robichaux v. Pool, *supra*. Even if the law

permitted the acquisition of title to immovable property by estoppel, Inexco has not proven the elements of estoppel. Silence gives rise to an estoppel only if the party who is silent is under a duty to speak. Johnson v. Smallenberger, 237 La. 11, 110 So.2d 119 (1959); Carver v. Liberty Mutual Insurance Co., 277 F.2d 105 (5th Cir. 1960). A party is under such a duty only if he had knowledge of the facts and the adverse party should have been ignorant of the truth. Parker v. Ohio Oil Co., 191 La. 896, 186 So. 604 (1939); Harvey v. Richard, 200 La. 97, 7 So.2d 674 (1942). Crutcher-Tufts had access to no facts concerning the Pardee Company No. 2 Well other than those obtained from Inexco. Crutcher-Tufts thus knew nothing as to which Inexco was ignorant. On the contrary, if either party was under a duty to speak concerning the Pardee Company No. 2 well, it was Inexco. The Farmout Agreements required Inexco to communicate to Crutcher-Tufts all information and data obtained during the drilling of the well. Further Inexco neither alleged nor proved an act taken by it in which it relied on the silence of Crutcher-Tufts and changed its position to its detriment. See Olin Gas Transmission v. Harrison, 132 So.2d 721 (La.App. 1st Cir. 1961); American Bank & Trust Co. v. Trinity Universal Insurance Co., 251 La. 445, 205 So.2d 35 (1967).

### 8.

■ Inexco has also urged that, even if it has failed to prove that the Pardee Company No. 2 Well encountered domal material, it is entitled to an assignment of interests under the doctrine of "substantial compliance" because the object of the Crutcher-Tufts Farmout Agreements was to penetrate and produce the productive Sands of the Wilcox Formation and this had been accomplished. In answer to this contention, we find that in Louisiana, the doctrine of "substantial compliance" is limited to construction contracts and is not appropriate or pertinent to a contract such as a farmout agreement. Book III, Title IX, Chapter 3, Section 3 of the Louisiana Civil Code. C. H. Leavell & Co. v. Board of Com'n of Port of New Orleans, 292 F.Supp. 727 (E.D.La.1968); Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir. 1969); Lillis v. Anderson, 21 So.2d 389 (La.App.Orl.1945); Loeb v. Neilson, 128 So.2d 447 (La.App. 4th Cir. 1961); Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961).

### 9.

The defendant, Crutcher-Tufts Corporation, is entitled to an accounting from Inexco for 5.2113% of all production from the Unit "B", created by Order Nos. 98–L, 98–M and 98–N, issued by the Commissioner of Conservation for the State of Louisiana, or the proceeds therefrom, from the date of first production, less 5.2113% of the cost of development and operation of the said Unit "B", plus a reasonable charge for supervision. The defendants, Albert B. Crutcher, Jr. and J. D. Tufts, II, are entitled to an accounting from Inexco for 19.4080% of all production from the said Unit "B", or the proceeds therefrom, from date of first production, less 19.4080% of the cost of development and operation of the said Unit "B", plus a reasonable charge for supervision. The costs of development and operation of the said Unit "B" are fixed at $519,757.-55, plus the actual cost to Inexco of operating the same, including a reasonable charge for supervision. All defendants are also entitled to a regular monthly accounting for all production from said Unit "B", or any revision or replacement thereof operated by Inexco, its successors or assigns, so long as said Unit, or any revision or replacement thereof is capable of producing in paying quantities.

An appropriate judgment, approved as to form by the parties, should be submitted for execution.