203 So.2d 847 (1967)
L. A. MUHLEISEN and Mrs. Isabella Muhleisen, d/b/a L. A. Muhleisen & Son, and Mr. and Mrs. Ignace Theriot
v.
ALLSTATE INSURANCE COMPANY.
No. 2742.
Court of Appeal of Louisiana, Fourth Circuit.
November 6, 1967.
Rehearing Denied December 4, 1967.
Simon & Simon, Warren M. Simon, Jr., New Orleans, for plaintiffs-appellants.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Curtis R. Boisfontaine, E.
*848 Kelleher Simon, New Orleans, for defendant-appellee.
Before McBRIDE, REGAN and BARNETTE, JJ.
BARNETTE, Judge.
Plaintiffs seek to recover funeral expenses from Allstate Insurance Company for seven persons, members of two related families, killed in an automobile-train collision. They allege that an agent of Allstate represented to them that a liability insurance policy had been issued to the owner-driver of the automobile in which all the victims met their death and that there was a $2,000 maximum funeral expense coverage for each of the seven victims. The alleged representation of coverage resulted from an error in defendant's records. The error was discovered after the expenses were incurred. Allstate refused payment. Plaintiffs base their claim on a plea of equitable estoppel, asserting that (1) there was a representation; (2) they relied on it; and (3) they changed their position to their detriment by incurring funeral expenses far in excess of what otherwise would have been incurred. From a judgment for defendant rejecting plaintiffs' demand and dismissing their suit, plaintiffs have appealed.
On Easter Sunday, April 14, 1963, an automobile owned and driven by Clarence C. Theriot collided with a locomotive at a railway crossing in St. Charles Parish killing Theriot, his wife and their two children, and his brother Leonard Theriot, his wife and their child. All seven bodies were removed from the scene of disaster to the funeral home of L. A. Muhleisen & Son to await instructions for burial.
The deceased persons were survived by Mr. and Mrs. Ignace Theriot, parents of Clarence and Leonard, and grandparents of the children. Ignace Theriot assumed responsibility for burial, and he sent his surviving son Harry to the funeral home to discuss funeral plans. Harry Theriot's initial visit to the funeral home was late Sunday, the day of the fatal accident. He authorized embalming and such other procedures necessary to meet minimum requirements. Selection of caskets and funeral plans were left for later discussion.
A representative of Allstate Insurance Company in Baton Rouge, upon hearing of the tragic accident, recalled immediately that his office had insured a Clarence Theriot and reported the accident to the Baton Rouge claims representative. This information was communicated by telephone to the New Orleans office of Allstate, Monday morning, April 15. The New Orleans office accomplished the work necessary to set up a new file, then referred the matter to Gulf Coast Adjustment Corporation, an independent claim adjustment agency, for investigation. At this point, coverage had not been confirmed and Gulf Coast was so advised. The exact time of referral on April 15 is unknown, but the record supports the conclusion that it was in the afternoon of that day.
There were in fact two Clarence Theriots listed as policy holders in Allstate's files: the deceased, who lived in Baton Rouge at 9908 Jefferson Highway and had a home owner's policy; and a man by the same name who lived at Hayes, Louisiana, insured under an automobile liability policy. Through an acknowledged error in Allstate's office, the two Theriots were confused and Allstate's records indicated that the Clarence Theriot who lived at 9908 Jefferson Highway in Baton Rouge, the deceased, was covered under the automobile liability policy. Just when the error was discovered is not clear from the record, but it was not until after the funeral on April 17. During the time funeral preparations were in progress, Allstate had not confirmed coverage, but proceeded with its investigation under the belief that Clarence Theriot, the deceased, was its insured under the automobile liability policy.
After receiving a call from Allstate on April 15, James I. Jones, manager of the *849 Metairie office of Gulf Coast Adjustment Corporation, personally went to Allstate's office to pick up the referral sheet on the Theriot matter. It was then that the investigation was assigned to Gulf Coast's adjuster Marcel Ramagosa. The time of this assignment has material significance in view of the representations alleged to have been made by Ramagosa in the early afternoon of April 15. Jones testified that the assignment to Ramagosa was made either later Monday afternoon or Tuesday morning. Ramagosa testified that he did not get the assignment until Tuesday morning.
On Monday, April 15, Harry Theriot returned to the Muhleisen Funeral Home to complete funeral arrangements. He informed George Prestridge, managing funeral director for the Muhleisen home in Metairie, thas his brother had no insurance; that his father, Ignace Theriot, was a man of limited means; and that they could afford no more than minimum services. While the two were discussing arrangements with the intention of using inexpensive caskets and closed coffin services, it is alleged that Prestridge was called to the telephone by Muhleisen. He returned to his discussion of plans with Harry Theriot and told him that Marcel Ramagosa had called to say that he represented Allstate as an employee of Gulf Coast Adjustment Company. Prestridge testified: "He stated that he thought we might be interested to know that his Company had coverage of $2,000 per person involved in the accident." At this point, without further inquiry, the decision was made to do a complete restoration of the mangled bodies and have glass top caskets and the more expensive service for which Allstate was later billed in the sum of $11,537.62. Prestridge further testified that Ramagosa came to the funeral home later that afteroon and left his card.
Ramagosa vigorously denied that he made such representation to Prestridge. He stated emphatically that he had no contact whatever with any representative of the funeral home until Friday, two days after the funeral.
Lewis Muhleisen testified that a person identifying himself as Ramagosa, an insurance adjuster, telephoned the funeral home on Monday, April 15. He placed the time of the call as "after lunch, early afternoon," and again "sometime right after lunch." He testified that Ramagosa said he was calling in regard to the Theriots; whereupon, he, Muhleisen, called Prestridge to the phone, since Prestridge was handling the funeral arrangements. Muhleisen had no personal knowledge of Ramagosa's alleged representations and had no conversation with him until a week or two after the funeral.
Harry Theriot had no knowledge of the alleged representations made by Ramagosa to Prestridge except as related to him by Prestridge. Following the alleged telephone call, Harry Theriot returned to his father's home and there, according to his testimony, met Ramagosa, who had called on the elder Theriots. He testified:
"Q. You were there when he called on your father?
"A. That is right.
"Q. Did he tell you, did you have any personal conversation with Mr. Ramagosa?
"A. Yes, he said he was a representative for Allstate and it was something to this effect and he had to come about some insurance and about that time I told my dad don't sign nothing and we are going to get an attorney to handle and don't fool with this man because I don't know exactly who he was and I wasn't sure and I didn't want my daddy to sign any papers.
"Q. When you were present in your father's home did Mr. Ramagosa *850 tell you anything with regard to funeral expenses?
"A. Not that I can remember.
"Q. Did you see him anytime after that?
"A. No I don't think so."
Ignace Theriot testified that Ramagosa came to his home "right after the noon hour" on "the Monday after Easter Sunday" and said he was representing Allstate Insurance Company and testified as follows:
"Q. Did he tell you anything with regards to any funeral or burial expenses for policies that he had?
"A. He said that Clarence my son he had a liability policy.
"Q. Did he tell you that it provided anything for the burial of your son and children?
"A. It provided $2,000.00 a person."
The foregoing is a summary of all the testimony in the record relating specifically to Ramogosa's alleged representation of funeral expense coverage. All of this is denied by Ramagosa. He sought to corroborate his denial by the fact that the case was not assigned to him until after the time of the alleged conversations Monday afternoon, as testified by Jones, who made the assignment. Further corroboration was attempted by reference to his daily work report sheets which showed no reference to the Theriot case until Tuesday, April 16.
In addition to these questions of fact, there is the issue of sufficiency of proof of the alleged items of expense totaling $11,537.62. There are several apparent irregularities in the bills submitted by the funeral home, and some items appear to be duplications. Also the record does not disclose the amount of expense which would have been incurred even if the alleged representation had not been made. Obviously the Theriot family would have had some expense and in fact had obligated themselves to at least the basic costs of funeral services on the Sunday night prior to Ramagosa's alleged representations. There were implications of "indigence" yet Ignace Theriot was employed as an "operating engineer" in the maintenance department of Louisiana State University in New Orleans. Also there were certain social security and veteran benefits available to the Theriot family. There is a vague reference to a minimum cost of $400 per person, plus certain additional charges for burial in Baton Rouge, but there is no reliable evidence of what the actual expenses would have been. Obviously, if plaintiffs changed their position to their detriment by reliance on the alleged representations of defendant's agent Ramagosa, the detriment they could claim could be only the difference between the expenses which would have been incurred in any event and the legitimate charges above that figure. That amount cannot be determined with any degree of certainty from the record before us.
Since the trial judge gave no reasons for judgment, we have no way of knowing whether his judgment is based on legal or factual findings or insufficiency of proof of loss.
It is our opinion, however, that the plaintiffs have failed to carry the burden of proving a cause of action against defendant. Pretermitting the seriously disputed question of fact as to the alleged representation by Ramagosa, and assuming arguendo that it was made in the manner and words to which Prestridge and Ignace Theriot testified, we must hold that representation was not enough to justify plaintiffs' reliance on the belief that Allstate had confirmed insurance coverage. They cannot recover on the basis of equitable estoppel, and, having neither alleged nor proven any other basis, recovery must be denied.
"The cases holding that estoppels are not favored by our courts are legion in *851 our jurisprudence." Harvey v. Richard, 200 La. 97, 7 So.2d 674 (1942). One who seeks to avail himself of the application of the principle must establish his right to do so with unusual clearness. Henderson v. Rossi, 185 So.2d 92 (La.App.4th Cir. 1966); Taylor v. Turner, 45 So.2d 107 (La.App.2d Cir. 1950). A party may not invoke the doctrine of equitable estoppel except in good faith and after having exercised such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or misunderstanding. Being an equitable remedy, it must be applied with equity.
It cannot be denied that a serious record-keeping error was committed by Allstate. This is conceded. As a result of that error its own agents and employees were under the belief that the Clarence Theriot who lost his life in the accident was the Clarence Theriot named in their records as an insured under an automobile liability policy. Proceeding under this belief, Allstate's representatives did precisely what they should have done. With six guest passengers killed, Allstate was exposed to maximum liability and could not delay an investigation while awaiting confirmation through channels of interoffice communication. Allstate's employees were careful to advise the independent adjusting agency that coverage was not confirmed and this notice was written across the face of the assignment notice to Ramagosa.
Even in the light of Allstate's fault, and assuming arguendo that its agent Ramagosa failed to tell plaintiffs that coverage was not confirmed, we cannot escape the fact that plaintiffs also were at fault by failing to exercise the diligence which such circumstance would require of any reasonably prudent person. Atlantic Refining Company v. Golson, 127 So.2d 341 (La.App. 2d Cir. 1961).
The Theriots thought their son and brother had no automobile liability insurance and they so advised Muhleisen's manager Prestridge. Then Prestridge allegedly received a telephone call from a party identified as an employee of an independent adjusting agency who allegedly told him that Allstate had coverage for funeral expenses up to $2,000 per person and to mail the bills to Allstate. It would have been a simple thing for Prestridge, Muhleisen or the Theriots to call Allstate's local office for confirmation. Had they done so, they would have been told that coverage was not confirmed. There were several factors which plaintiffs should have considered: the substantial amount of credit involved; the emotional state of the bereaved family; the fact that Harry Theriot thought that his brother had no insurance and had so advised the funeral home; and finally the alleged representation of coverage was communicated by telephone by a person employed by an independent adjusting company. Under such circumstances, it was a lack of diligence on the part of plaintiffs, who must have been taken by surprise by the alleged representation, not to require something in writing, or at least a confirmation direct from Allstate by telephone.
In Shirey v. Campbell, 151 So.2d 557 (La.App.2d Cir. 1963), the court said:
"The doctrine [equitable estoppel], however, should not be accorded inequitable application. Intent is an essential element of equitable estoppel. Thus, it is essential to equitable estoppel that the matters claimed to create it were intended to lead the other party to act thereon or that there were reasonable grounds to anticipate that he would so act. The doctrine, however, has no application unless the person invoking it relied, and had a right to rely, upon the representation or conduct of the person, or persons, sought to be estopped. Hence, there is no compliance with this rule requiring reliance upon representations, express or implied, as an element of estoppel where the person pleading the estoppel had actual knowledge or ready or convenient means of acquiring knowledge of the facts concerning which the representations were made. 31 C.J.S. Estoppel §§ 59-71, pp. 236-273." 151 So.2d at 560.
*852 We think this rationale is applicable to the facts before us.
In Harvey v. Richard, supra, cited and followed in Shirey v. Campbell, supra, and quoted in American Bank & Trust Co. v. Trinity Universal Ins. Co., 194 So.2d 164 (La.App.1st Cir. 1966), the Supreme Court said:
"The cases holding that estoppels are not favored by our courts are legion in our jurisprudence. Whenever estoppel is pleaded as an element of a cause of action, it must be pleaded specifically, the burden of proving the facts upon which the estoppel is founded, as well as the affirmative showing that he was misled by the acts and forced to act to his prejudice, resting upon the party invoking the doctrine. Heirs of Wood v. Nicholls, 33 La.Ann. 744; Thomas v. Blair, 111 La. 678, 35 So. 811; and Hebert v. Champagne, 144 La. 659, 81 So. 217." 7 So.2d at 677.
The foregoing phrase "forced to act to his prejudice" certainly was not intended to imply a coercion, but rather that reliance upon the representation was made necessary because of the want of ready and convenient means of acquiring knowledge of the facts concerning which the representation was made. Here the plaintiffs had such ready and convenient means and were not forced of necessity to rely upon the alleged representation.
Good faith is generally regarded as a necessary element in the application of the principle of equitable estoppel. A party having means readily and conveniently available to determine the true facts, but who fails to do so, cannot claim to have acted in complete good faith.
Having reached the foregoing conclusion, it is not necessary to consider which of the disputing witnesses is more worthy of belief or whether the alleged representation was in fact made as plaintiffs contend. Nor is it necessary to discuss in more detail the disputed items of expense.
For whatever reasons, it is apparent that the trial judge was of the opinion that the plaintiffs failed to discharge the burden of proof required to grant the relief sought. We find no error in that judgment.
The judgment appealed from is affirmed at appellants' cost.
Affirmed.