342 So.2d 683 (1977)
Neil DASPIT, Plaintiff and Appellant,
v.
CITY OF ALEXANDRIA, Louisiana, Defendant and Appellee.
No. 5709.
Court of Appeal of Louisiana, Third Circuit.
January 31, 1977.
Rehearing Denied March 2, 1977.
Writ Refused April 26, 1977.
*684 Gold, Hall, Hammill & Little by Charles S. Weems, III, Alexandria, for plaintiff and appellant.
Ford & Nugent by Howard N. Nugent, Jr., Gus Voltz, Jr., Alexandria, for defendant and appellee.
Before CULPEPPER, WATSON and GUIDRY, JJ.
*685 CULPEPPER, Judge.
Plaintiff, Neil Daspit, filed this suit for damages in the sum of $214,250 allegedly suffered as a result of the defendant, City of Alexandria, breaching a contract to operate a sanitary landfill on plaintiff's property. In the alternative, and in the event there was no contract, plaintiff seeks the same amount in quantum meruit. The trial judge found there was a contract and awarded plaintiff the sum of $8,750, representing the diminution in value of plaintiff's property caused by the City's use thereof. Plaintiff appealed, seeking an increase in the award. The City answered the appeal, contending no damages are due.
The substantial issues on appeal are (1) Does the letter agreement signed by Mayor Karst and plaintiff constitute a valid contract obligating the City to use plaintiff's property as a "sanitary landfill", or was Mayor Karst without authority to execute such a contract? (2) Under the circumstances of the present case, is the City estopped to deny the validity of the purported contract? (3) Is plaintiff entitled to damages under the doctrine of unjust enrichment or quantum meruit?
During mid-year of 1969, the City was advised by the Louisiana State Department of Health that its method of refuse disposal was unsatisfactory and in violation of the Sanitary Code of the State of Louisiana. In response to this criticism, the Rapides Area Planning Commission completed a solid waste disposal plan in September of 1971. The Rapides Area Planning Commission is a council comprised of the governing bodies of the City of Alexandria, the City of Pineville, and the Parish of Rapides. Representing the City of Alexandria at the time in question were Mayor Edward Karst and the two City Commissioners, O'Hearn Matthews and Carroll Lanier.
After an investigation into the various methods of waste disposal, the Planning Commission determined that a conventional sanitary landfill would be the most feasible operation for the Rapides Parish area. The Rapides Parish Sanitation Board prepared a study which set forth recommendations for suitable landfill sites in the Parish. This study cited soil types, available fill, cover materials, financing, distance required to transport the waste material, etc. as factors to be considered in choosing a suitable site for the landfill.
Using the criteria listed, the Sanitation Board evaluated several proposed landfill sites, including 100 acres owned by Daspit and located about three miles south of Alexandria. In a report dated March 28, 1972, the Board rejected the Daspit property, stating that a geological survey by the Louisiana Conservation Department disclosed it had inadequate cover material and a severe drainage problem, since it was located in the Bayou Boeuf floodway. In concluding its report, the Sanitation Board found several other proposed sites to be acceptable as possible waste disposal areas. Daspit was aware of the Sanitation Board's rejection of his property.
The alleged contract between plaintiff and the City of Alexandria is in the form of a letter dated June 30, 1972 which reads as follows:
 "June 30, 1972
 3310 Horseshoe Drive
 Alexandria, La. 71301
Dear Mayor Karst;
This is your authority and permission to use my land on the Lake Charles Highway located approximately 3 miles from the South Circle for the purpose of operating a sanitary landfill for the City of Alexandria. It is understood that the City of Alexandria may permit its use by others. It is further understood that you will first utilize the 15 acres closest to the City of Alexandria that is bounded by Ewing property on the north.
The consideration for the use of my property is the good faith negotiation on the part of the City of Alexandria with me in the event that I should desire to operate the landfill on the terms and conditions that are included in the proposal of the Rapides Parish Sanitation Board. However in no event shall the City be denied the right to utilize the *686 above mentioned 15 acres as a sanitary landfill.
It is understood that when the City of Alexandria completes the use of the 15 acres it will return the land to me.
If this proposal is satisfactory to you please sign below and return a copy to me.
 Sincerely,
 /s/ NEIL DASPIT
 Neil DASPIT
 /s/ C E KARST
C. Edward Karst, Mayor"
The 15 acres offered as a landfill site are part of the 100-acre tract rejected by the Sanitation Board in its report of March 28, 1972. Thus, Daspit was aware of the deficiencies in his property for use as a "sanitary landfill."
Mayor Karst signed the proposal without presentation to, consultation with, or formal action by the Alexandria City Commission. In fact, there is no evidence that the other two members of the Commission ever saw the letter agreement signed by Karst.
The City of Alexandria has a commission form of government, composed of a mayor (who administers the Departments of Fire, Police and Sanitation), a commissioner of streets and parks, and a commissioner of finance and utilities. Karst was the mayor from June 17, 1969 until his term expired on June 17, 1973. Serving with him during this time were Carroll Lanier, Commissioner of Finance and Utilities, and O'Hearn Matthews, Commissioner of Streets and Parks.
The City began using Daspit's property as a landfill in the first part of July, 1972. Work crews were transferred from the Department of Streets and Parks to the Sanitation Department in an attempt to ready the site for waste disposal. Roads into the landfill site were constructed, and the City authorized the purchase of a dragline in order to dig trenches on the site. In November of 1972, the City, under the authorization given by plaintiff, allowed the Rapides Parish Police Jury to use the property as a waste disposal area. All of these actions relating to the use of the Daspit property were subjects of discussion and action at City Council meetings. It is clear, therefore, that Commissioners Lanier and Matthews were aware that the City was using the Daspit property as a solid waste disposal site, and it is also clear that they never objected to the City's use of the property.
The City experienced no problems in the operation of the landfill on plaintiff's property until about November of 1972. Until this time, the operation ran smoothly and each day the garbage was dumped into the trenches, compacted, and then covered with soil, all in accordance with prescribed landfill methods as testified to by plaintiff's expert, Donald R. Schneider. The situation became complicated thereafter when the Parish of Rapides began to utilize the area for disposal of solid waste. A further complication arose as a result of unusually heavy rains which caused most of the area to flood. The flood marked the end of the use of the Daspit property as a "sanitary landfill". The bulldozer which was used to compact garbage got stuck in the mud. The garbage trucks could not venture off of the main road through the property. The operation from this point onward was described by the City's Sanitation superintendent as a "nightmare". The refuse was not compacted and covered on a daily basis. We reiterate, however, that both the plaintiff and Mayor Karst knew, when the letter agreement was signed, that the property was subject to the flooding conditions which finally stymied the landfill operation.
The City ceased operations on the Daspit property in late September of 1973. The property was raised an average of four to five feet in elevation by the operations, but it was poorly leveled. Partially buried refuse protruded through about one-fourth of the property's surface. Some ponds remained, but test results show that the garbage was covered with six inches to 36 inches of soil.
Plaintiff never requested that the City quit dumping garbage on his property. It was not until the City ceased its operations that plaintiff filed this suit. We note that *687 the garbage dumping operations continued through a change in City administration in June of 1973, following the election of John Snyder as Mayor, Malcolm Hebert as Commissioner of Streets and Parks, and Arnold Jack Rosenthal as Commissioner of Finance and Utilities.
The first issue is whether the above quoted letter agreement signed by only Mayor Karst and plaintiff was a valid contract obligating the City to conduct a "sanitary landfill" on plaintiff's property. The trial court determined that this letter constituted a valid contract between the City and plaintiff for use of plaintiff's property as a "sanitary landfill". We do not agree.
The governing authority of the City of Alexandria is the commission council composed of the mayor and two commissioners. The mayor and the commissioners have only such authority to administer the City departments and to sign city contracts as is granted to them by the commission council. Foti v. Montero, 243 La. 734, 146 So.2d 789 (1962). In Foti, the Supreme Court rejected the argument that each commissioner has authority to act or contract in respect to his own department without an authorization from the council. Similarly, in Smith v. Town of Vinton, 209 La. 587, 25 So.2d 237 (1946) the court stated that as a general rule a mayor acting alone is without power to execute a contract binding on the city in the absence of an ordinance or resolution by the governing council authorizing him to do so. In the present case, the Alexandria City Commission did not authorize Mayor Karst to execute a contract obligating the City to use the subject property as a "sanitary landfill". Consequently, we hold that the letter agreement executed by Mayor Karst did not constitute a valid contract with binding effect upon the City.
Alternatively, plaintiff argues that the doctrine of equitable estoppel should be invoked to prevent the City from denying the validity of the contract. We do not agree.
Our Supreme Court defined the doctrine of equitable estoppel in American Bank & Trust Company v. Trinity Universal Insurance Company, 251 La. 445, 205 So.2d 35 (1967) as follows:
Equitable estoppel may be defined as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. Founded upon good faith, the doctrine is designed to prevent injustice by barring a party, under special circumstances, from taking a position contrary to his prior acts, admissions, representations, or silence. Montague v. Weil & Bro., 30 La.Ann. 50; Shirey v. Campbell, La.App., 151 So.2d 557; 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 804, pp. 188-190; 31 C.J.S. Estoppel § 59, pp. 367-377; 28 Am. Jur.2d, Estoppel and Waiver, § 27, pp. 627-629.
The doctrine is applicable to municipalities under certain special circumstances, if the act or conduct relied on to create the estoppel is within the corporate power of the municipality. See Rogers v. First Sewerage District of Lake Charles et al., 171 So.2d 820 (La.App.3rd Cir. 1965). Unquestionably, waste disposal is within the corporate powers of the City of Alexandria. LSA-R.S. 33:401.
The doctrine of equitable estoppel, however, is not favored in the law because it bars the normal assertion of rights. Accordingly, courts apply the doctrine cautiously. American Bank v. Trinity Universal Insurance Company, supra. As we explained in Rodden v. Davis, 293 So.2d 578 (La.App.3rd Cir. 1974, writ refused, La., 296 So.2d 832):
One who seeks to avail himself of the application of the principle must establish his right to do so with unusual clearness. A party may not invoke the doctrine of equitable estoppel except in good faith and after having exercised such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or misunderstanding. Being an *688 equitable remedy, it must be applied with equity. Harvey v. Richard, 200 La. 97, 7 So.2d 674 (1942); Taylor v. Turner, 45 So.2d 107 (La.App.2nd Cir. 1950); Henderson v. Rossi, 185 So.2d 92 (La.App.4th Cir. 1966); Muhleisen v. Allstate Insurance Company, 203 So.2d 847 (La.App. 4th Cir. 1967).
Plaintiff argues that the City is estopped to deny the validity of the contract by both its affirmative conduct and its silence. The conduct upon which plaintiff relies to set up the estoppel is the City's use of his property for waste disposal. The silence or inaction upon which plaintiff relies is the failure of any city official, including the commissioners, to object to the use of the property or to indicate in any manner that they did not intend to fulfill the terms of the "contract".
There is no evidence that either Commissioner Lanier or Commissioner Matthews had any knowledge of the "contract" executed by Mayor Karst. To the contrary, Commissioner Lanier testified that he never saw the letter agreement. Commissioner Matthews was deceased at the time of the trial, so we do not have the benefit of his testimony on this point. The letter agreement was kept in Mayor Karst's private files rather than in the files of the secretary-treasurer of the City with all of the other contracts to which the City was a party. Any knowledge that Commissioners Lanier and Matthews had of the agreement was gleaned from their reading reports in the public press and observation of the waste disposal activities on the Daspit property. From press accounts, the commissioners knew only that Mayor Karst had secured the permission of Daspit to use his property as a "sanitary landfill". An article in the July 20, 1972 edition of the Alexandria Daily Town Talk conveyed the impression that there was no written contract, stating:
". . . [T]here appears to be no written agreement, just a letter of authorization between the City and Daspit.
"City Attorney Howard Gist, asked about this, said he had not been contacted for any opinion relative to the landfill or to assist in drawing up any contract or agreement papers."
We recognize, of course, that the description of the letter agreement contained in the newspaper article is not conclusive as to its legal nature or binding effect, but we note that Commissioners Lanier and Matthews, who were not lawyers, could conclude from reading the article that no written contract existed. In summary, the other two commissioners knew only that Daspit authorized the City to use his property free of charge as a "sanitary landfill" and that the property was actually used for disposal of solid waste.
The commissioners had no knowledge of the most significant facts of this case. They did not know that Mayor Karst had signed the letter purporting to bind the City to use the Daspit property as a "sanitary landfill". Even if they had known of the letter's contents, they could not have known that Daspit interpreted the vague phrase "sanitary landfill" to mean nothing less than a guarantee on the part of the City to raise the elevation of the property several feet, level it, slope it, provide for its drainage, and finally seed it with grass. In other words, the commissioners had no way of knowing that Mayor Karst had, without authority, executed a contract, which, Daspit contends, bound the City to transform Daspit's low-lying, low value property into high, dry, valuable commercial highway frontage.
There is a line of jurisprudence holding that under special circumstances a governmental body can be estopped from denying the validity of a contract executed by a government official. One such case is Rogers v. First Sewerage District of Lake Charles et al., supra. There, we held that even though the president of the Sewerage Board exceeded his authority by allowing plaintiff to connect his sewerage line from his home outside the district to the system maintained by the District, the Sewerage Board was'estopped to deny sewerage service to the plaintiff because the members of the Board had full knowledge of the occurrence. In Smith v. Town of Vinton, supra, *689 the mayor, without authority from the council, signed a contract with plaintiff to repair the town's electric utility system. The court found that all of the members of the Board had full knowledge of the contract and of the fact that it had been performed, and held that plaintiff could invoke the doctrine of equitable estoppel against the city. Without expressly so stating, the courts in these two cases made it clear that equitable estoppel can be invoked to prevent a municipality from denying the validity of a contract only when the governing council has full knowledge of the existence of the contract and of its terms. To hold otherwise would foster the use of the secret agreement as a device to evade the formalities required by law to contract with municipalities.
Plaintiff's estoppel argument rests heavily on the City's silence, inaction, or failure to question the "contract". In Harvey v. Richard, supra, our Supreme Court held that to effect an "estoppel by silence" the person estopped must have full knowledge of the facts and of his rights, and must also have an intent or willingness that others be deceived. See also Parker v. Ohio Oil Company, 191 La. 896, 186 So. 604 (1939); Westenberger v. State of Louisiana, 333 So.2d 264 (La.App. 1st Cir. 1976). In the present case, the city governing body had neither full knowledge of the facts nor did it have a demonstrated intent to deceive the plaintiff. The Harvey, Parker and Westenberger cases, supra, are factually distinguishable from the present case, but they do tend to support the rule which we distilled from Smith v. Town of Vinton and Rogers v. First Sewerage Board, namely, that a city is not estopped to deny the validity of a contract when its governing board does not know of the existence and the terms of the contract.
The doctrine of equitable estoppel is founded on good faith and is designed to prevent injustice under special circumstances. From the facts of the present case, we do not conclude that plaintiff acted in bad faith, but he has clearly not suffered an injustice requiring application of the doctrine of equitable estoppel. First, there is a serious question as to whether Daspit, who appears from the record to have been an experienced land speculator, justifiably relied on Mayor Karst's authority to execute a binding.landfill contract. In State ex rel. Re-Lu, Inc. v. City of Kenner, 284 So.2d 866 (La.App. 4th Cir. 1973) the court held that unless the injured party was justified in his reliance on the conduct of city officials, estoppel was of no legal consequence. Second, Daspit sat idly by while the City operated the landfill for several months in a manner which, according to his expert witness, was not consistent with good sanitary landfill procedure. Notably, the letter agreement stated no minimum or maximum time period for utilization of the property and presumably either party could have terminated the contract at any time. Daspit never demanded that the City stop dumping garbage on his property and he did not file this suit until the City voluntarily discontinued its operations. He complained to Mayor Karst, but did not bring the matter to the attention of the other commissioners. Third, Daspit knew that his property was subject to flooding and that the property had recently been rejected as a landfill site by the Sanitation Board on the grounds that it had inadequate cover material and poor drainage. Fourth, despite the testimony of real estate appraisers that the landfill operations reduced the market value of the land, a strong argument could be made that by raising the level of the property to prevent flooding, the City may have actually increased the value of the land. Considering all of these facts, it is clear that the present case does not fall within the exceptional class of cases where the doctrine of equitable estoppel should be applied.
Having concluded that no contract existed, and that the City is not estopped to deny the agreement, we now address plaintiff's alternative claim for recovery of damages under the theory of unjust enrichment or quantum meruit. The doctrine of unjust enrichment is based on Article 1965 of our Civil Code which states that no one ought to enrich himself at the expense *690 of another. Courts have employed the doctrine to allow recovery where there is no contract but a municipality reaps benefits from another party. See Brock v. Town of Kentwood, 196 La. 318, 199 So. 133 (1940); Hinkle v. City of West Monroe, 196 La. 1078, 200 So. 468 (1941). In Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967) the Supreme Court listed the following elements necessary for recovery under unjust enrichment: (1) An enrichment. (2) An impoverishment. (3) A connection between the enrichment and the resulting impoverishment. (4) An absence of justification for the enrichment or improverishment, and (5) The absence of any other remedy at law.
In the present case, the last three listed requirements are clearly satisfied. Moreover, the enrichment requirement is satisfied because the City acquired the use of the Daspit property as a waste disposal site without having to pay any rent or other fee. The impoverishment requirement, however, is not so easily satisfied by the facts of the present case. Any impoverishment to plaintiff would flow from his inability to use the land during the time it was utilized by the City as a landfill and from the reduced market value of the land after its use. Plaintiff failed to prove that he suffered any damage in loss or rent or otherwise as a result of his inability to use the land while it was used by the City. However, the City's own expert real estate appraiser, Hab Monsur, testified that the market value of the property was reduced by $8,750 between the date of commencement of the City's use of the property and the date that the City ceased its use of the property. On the basis of Monsur's testimony, the trial judge awarded plaintiff general damages of $8,750. As we stated previously, it is difficult for us to perceive how low-lying property of no commercial value, which was formerly subject to periodic flooding, could be reduced in value by landfill operations which raised its elevation by four or five feet. Nevertheless, since the City's own expert testified there was a reduction in value of $8,750, we find this was a reasonable evidentiary basis for the trial judge's award, and was within his discretion. Accordingly, we affirm the court's award of $8,750 in general damages. No issue is presented as to the amount allowed plaintiff for the fees of his experts. Therefore, we affirm the trial judge's award of $1,900 to plaintiff to cover the fees of experts.
Because we concluded that no contract existed between Daspit and the City and that the City is not estopped, it is not necessary that we reach the issue of whether the sanitary landfill site was a "public work" under the provisions of the Public Bid Law (LSA-R.S. 38:2211), thus rendering the contract null and void for failure to follow the formalities of that statute.
For the reasons assigned, the judgment of the district court is affirmed. All costs are assessed against the City of Alexandria insofar as costs may be assessed against a municipality.
AFFIRMED.
GUIDRY, J., concurs and assigns written reasons.
GUIDRY, Judge, concurring.
In my opinion the City is estopped to question the validity of the letter agreement between plaintiff and Mayor Karst. The majority relies heavily on the fact that the other two commissioners never actually saw the letter agreement. This appears to be so, however, the record leaves little doubt but that the commissioners were fully aware of all of the provisions of that agreement, i. e., that the Daspit property had been offered to the City gratuitously for use as a "sanitary landfill"; that this gratuitous use had been accepted; and, that the City could permit its use by others. This operation on plaintiff's property became the subject of many discussions and resolutions of the Alexandria City Commission. Work crews, under the supervision of Commissioner O'Hearn Matthews, were transferred from the Department of Streets and Parks to the Sanitation Department in an attempt to ready the site for waste *691 disposal. Roads into the landfill site were constructed under the supervision of Commissioner Matthews. The City authorized the purchase of a dragline in order to build trenches, this transaction being presumably negotiated by Commissioner Lanier, who served as the Commissioner of Finance and Utilities. In November of 1972 the Commissioners by resolution authorized the Rapides Parish Police Jury to use the property as a waste disposal area. The City actually used this site as a "sanitary landfill" during the remainder of the terms of office of Mayor Karst and Commissioners Matthews and Lanier. Can it be said that under these circumstances the City is not estopped to question the validity of this agreement simply because the other two commissioners never actually saw the letter of agreement, which admittedly contained nothing that they were unfamiliar with.
I would find that the City is estopped to question the validity of the agreement which I determine to be a loan for use agreement as defined in LSA-R.C.C. Articles 2893 et seq. I would further find that the City must respond in damages (LSA-R. C.C. Articles 2898 and 2899) for its failure to employ the procedures generally applicable to all sanitary landfills, i. e., proper trenching, compaction, cover, etc., following November of 1972, and I would fix such damages in the amount determined by the trial judge to be due.
Finally I would determine that a loan for use agreement does not come within the intendment of the Public Bid Law.
For these reasons I respectfully concur in the result reached by the majority.